STATE OF CONNECTICUT *v.* EDDIE A. PEREZ
(AC 32747)

DiPentima, C. J., and Lavine and Bishop, Js.

Argued February 19—officially released December 17, 2013

*Hubert J. Santos*, with whom were *Hope C. Seeley* and, on the brief, *Jessica M. Santos*, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom were *Christopher A. Alexy*, senior assistant state's attorney, and, on the brief, *Gail P. Hardy*, state's attorney, and *Michael A. Gailor*, executive assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Eddie Alberto Perez, once mayor of the city of Hartford (city),[1] appeals from the judgments of conviction, rendered after a jury trial, of bribe receiving in violation of General Statutes § 53a-148 (a), fabricating evidence as an accessory in violation of General Statutes §§ 53a-155 (a) (2) and 53a-8, conspiracy to fabricate evidence in violation of General Statutes §§ 53a-155 (a) (2) and 53a-48, conspiracy to commit larceny in the first degree by extortion in violation of General Statutes §§ 53a-48, 53a-122 (a) (1) and 53a-119 (5) (H), and attempt to commit larceny in the first degree by extortion in violation of General

---

[1] Following his election, the defendant began his two year term as mayor of Hartford in December, 2001. The city's charter was changed in 2003, resulting in a strong-mayor form of municipal government and a four year term for the position of mayor. At the defendant's trial, Kenneth H. Kennedy, Jr., a former member of the Hartford Democratic Town Committee and, since 2003, an elected member of the Hartford City Council, testified that a "[s]trong-mayor form of government is where the mayor is not just the head of the council, more of in a ceremonial position, but actually has real power, to appoint all department heads, they all work for the mayor as opposed to working for the city manager, who used to be the chief executive officer; now, the mayor is the chief executive officer."

Statutes §§ 53a-49 (a) (2), 53a-122 (a) (1), and 53a-119 (5) (H).

On appeal, the defendant claims that (1) the evidence was insufficient to support his convictions, (2) the court improperly consolidated the two informations for trial, (3) the court improperly instructed the jury[2] and (4) the court improperly admitted into evidence testimony regarding uncharged misconduct.[3] We conclude that there was sufficient evidence to sustain the defendant's convictions. We further conclude that the court improperly joined the defendant's two criminal cases for a single trial, and, therefore, reverse the judgments of conviction and remand each case for a new trial. As a result of this determination, we do not reach the defendant's instructional or evidentiary claims.[4]

We begin by setting forth the relevant procedural history. On January 21, 2009, the state charged the defendant by information with bribe receiving, fabricating physical evidence and conspiracy to fabricate physical evidence. On May 7, 2010, by way of a substitute information, the state charged the defendant with bribe receiving, fabricating physical evidence, fabricating physical evidence as an accessory and conspiracy to

[2] Specifically, the defendant claims that the court improperly instructed the jury with respect to the bribe receiving and extortion charges, and improperly failed to give the jury an admitted perjurer instruction.

[3] Specifically, the defendant claims that the court improperly permitted the state to present evidence of other misconduct, namely, that he awarded Abraham Giles a license for parking rights at 1214 Main Street, Hartford, and that this was done for the purpose of benefiting Giles.

[4] As a general matter, when our appellate courts reverse the judgment and remand the case for a new trial, only claims likely to arise on retrial are addressed by the reviewing court. See, e.g., *State* v. *T.R.D.*, 286 Conn. 191, 195, 942 A.2d 1000 (2008); *State* v. *Braswell*, 145 Conn. App. 617, 619 n.2, 76 A.3d 231, cert. granted on other grounds, 310 Conn. 939, 79 A.3d 892 (2013). In the present case, our remand order is for two separate trials. Therefore, we cannot say that the claims relating to the jury instructions and other misconduct evidence are likely to arise, and thus we do not address them in this opinion.

fabricate physical evidence (hereinafter the bribery charges or bribery case). The defendant entered pleas of not guilty to all of the bribery charges on May 12, 2010.[5]

---

[5] The May 7, 2010 substitute information for the bribery charges alleged the following:

"Count One

"The undersigned Executive Assistant State's Attorney accuses [the defendant] of the crime of Bribe Receiving in violation of section 53a-148 (a) of the Connecticut General Statutes and charges that between January, 2005, and July, 2007, said [defendant], a public servant, solicited and accepted from Carlos Costa a benefit, to wit: remodeling work to his residence at 59 Bloomfield Avenue, Hartford, Connecticut, for, because of, and as consideration [for the defendant's] decision, opinion, recommendation and vote.

"Count Two

"The undersigned Executive Assistant State's Attorney further accuses [the defendant] of the crime of Fabricating Physical Evidence in violation of section 53a-155 (a) (2) of the Connecticut General Statutes and charges that on or about July 10, 2007, in the town of Rocky Hill, the [defendant], believing that an official proceeding was about to be instituted, presented a document, to wit: a bill from USA Contractors that purported to be for all remodeling work completed at [the defendant's] residence at 59 Bloomfield Avenue, Hartford, Connecticut, knowing that the invoice was false and with the purpose of misleading a public servant who may be engaged in such official proceeding.

"Count Three

"The undersigned Executive Assistant State's Attorney further accuses [the defendant] of the crime of Fabricating Physical Evidence in violation of sections 53a-8 and 53a-155 (a) (2) of the Connecticut General Statutes and charges that between January, 2006 and July, 2007, in or near the city of Hartford, the said [defendant], believing that an official proceeding was about to be instituted, and acting with the kind of mental state required for the crime of Fabricating Physical Evidence, solicited, requested, commanded, and intentionally aided Carlos Costa in making a document, to wit: a bill from USA Contractors that purported to be for all remodeling work completed at [the defendant's] residence at 59 Bloomfield Avenue, Hartford, Connecticut, knowing that the invoice was false and with the purpose of misleading a public servant who may be engaged in such official proceeding.

"Count Four

"The undersigned Executive Assistant State's Attorney further accuses [the defendant] of Conspiracy to Commit Fabricating Physical Evidence in violation of sections 53a-48 and 53-155 (a) (2) of the Connecticut General Statutes and charges that between January, 2007 and July, 2007, in the city of Hartford and the town of Rocky Hill, said [defendant] with intent that conduct constituting the crime of Fabricating Physical Evidence be performed, agreed with Carlos Costa, to engage in and cause the performance of such conduct, and one of them committed an overt act, including but not limited to the following, in support of the conspiracy: [1] The drafting of a bill from USA Contractors for what purported to be the total work done at 59 Bloomfield Avenue; [2] Presenting the bill from USA Contractors for the work done at 59 Bloomfield Avenue to the office of the Chief State's Attorney as a complete bill for all of the work done on the property."

Meanwhile, on August 28, 2009, in a separate information the state charged the defendant with attempt to commit larceny in the first degree by extortion, conspiracy to commit larceny in the first degree by extortion and conspiracy to commit coercion. On May 7, 2010, the state filed a substitute information charging the defendant with conspiracy to commit larceny in the first degree by extortion and attempt to commit larceny in the first degree by extortion (hereinafter the extortion charges or extortion case).[6] The defendant entered

---

[6] The May 7, 2010 substitute information for the extortion charges set forth the following allegations:

"Count One

"The undersigned Executive Assistant State's Attorney hereby accuses [the defendant] of the crime of Conspiracy to Commit Larceny in the First Degree by Extortion in violation of sections 53a-48, 53a-122 (a) (1), and 53a-119 (5) (H) of the Connecticut General Statutes and charges that between December, 2005 and May, 2007, in the city of Hartford, said [defendant], with intent that conduct constituting the crime of Larceny in the First Degree by Extortion be performed agreed with Abraham Giles to engage in or cause the performance of such conduct, and one of them committed an overt act, including but not limited to the following, in furtherance of the conspiracy: 1. In the early portion of 2006, in the city of Hartford, [the defendant], the mayor of Hartford, told Joseph Citino, who had made a proposal to purchase and develop the property at 1143 Main Street which was owned by the city of Hartford, that, in order for the purchase to be approved, he would have to 'take care' of Abraham Giles; 2. That in March, 2006, the city of Hartford, under the direction of [the defendant], set as one condition of Joseph Citino's purchase and development of the property at 1143 Main Street that Abraham Giles be allowed to remain in place on the property until Citino initiated his development program for the site; 3. During negotiations for the purchase of the property at 1143 Main Street in Hartford, Abraham Giles told Joseph Citino he would vacate the premises if he received two hundred fifty thousand dollars ($250,000) from Joseph Citino; 4. During negotiations for the purchase of the property at 1143 Main Street in Hartford, Abraham Giles told Joseph Citino that 'he was a good friend of [the defendant] and he could either help this project go forward or not'; 5. Abraham Giles agreed to vacate the premises at 1143 Main Street if he was paid one hundred thousand dollars ($100,000) by Citino.

"Count Two

"The undersigned Executive Assistant State's Attorney further accuses [the defendant] of Criminal Attempt to Commit Larceny in the First Degree by Extortion in violation of sections 53a-49 (a) (2), 53a-122 (a) (1), and 53a-119 (5) (H) of the Connecticut General Statutes and charges that between

not guilty pleas to all the extortion charges on May 12, 2010.

On or about September 10, 2009, the state filed a motion to consolidate the informations, to join the bribery charges with the extortion charges for a single trial. On November 4, 2009, the court held a hearing on the state's motion to consolidate. At the conclusion of that hearing, the court granted the state's motion. Jury selection commenced on April 12, 2010, and was completed ten days later. On May 12, 2010, after the court's initial remarks to the jury, including reading both of the operative informations, the defendant moved for a mistrial. Defense counsel argued that the defendant had been prejudiced because the jury knew of the bribery charges and the extortion charges. In the alternative, defense counsel requested that the court instruct the jury that the evidence presented during the bribery case could not be considered as part of the extortion case. The court agreed to the latter[7] and denied the motion for a mistrial.

The state then presented its case on the bribery charges. The jury heard testimony on these charges on May 12, May 13, May 14, May 17, May 18, May 19, May 20, and May 26, 2010. On May 20, 2010, the defendant filed a motion for severance of offenses pursuant to Practice Book § 41-18.[8] He claimed that the failure to

December, 2005, and May, 2007, in the city of Hartford, said [defendant], while acting with the intent to deprive Joseph Citino of property or to appropriate the same to a third person, to wit: Abraham Giles, intentionally did an act which was a substantial step in a course of conduct planned to culminate in the commission of the crime of Larceny in the First Degree by Extortion."

[7] On nearly every day of testimony, the court informed the jury to which case the evidence applied.

[8] Practice Book § 41-18 provides: "If it appears that a defendant is prejudiced by a joinder of offenses, the judicial authority may, upon its own motion or the motion of the defendant, order separate trials of the counts or provide whatever other relief justice may require."

sever would result in substantial injustice, and would deny him a fair trial and due process of law. He incorporated the arguments previously made in his objection to the state's motion to consolidate and claimed substantial prejudice from the fact that he wanted to testify as to the bribery charges but to exercise his fifth amendment right not to testify as to the extortion charges. The court heard argument on this motion and denied it. The state concluded its case on the bribery charges on May 26, 2010. The court then instructed the jury: "Furthermore, I remind you that these two cases must be considered separately; in other words, the evidence that has been presented by the state relating to the charges of bribe receiving and fabricating physical evidence may not be considered by you in regard to the second case. Likewise, the evidence the state introduces relating to the charge of attempted larceny by extortion and conspiracy to commit larceny by extortion cannot be considered by you in regard to the first case; they are two separate cases, each case must stand on its own proof and the charges must be proven by the state beyond a reasonable doubt."

The jury heard evidence on the extortion changes on May 26, May 27, June 2, June 3, June 4, June 7, and June 8, 2010. The state rested with respect to both sets of charges on June 8, 2010. On June 10, 2010, the defendant moved for a judgment of acquittal, a mistrial, and, in the alternative, to sever the two cases. The defendant also requested permission to testify only as to the bribery charges. The court denied the motion for a judgment of acquittal and deferred ruling on the other motions until the next day. After hearing argument, the court denied the defendant's remaining motions on June 11, 2010.

The defense presented evidence on June 10, June 11 and June 14, 2010. The state presented rebuttal evidence, and the evidentiary portion of the trial concluded

on June 14, 2010. The next day, defense counsel renewed the motions for a judgment of acquittal, mistrial and severance. The court denied the defendant's motions.

With respect to the bribery charges, the jury found the defendant guilty of bribe receiving, fabricating physical evidence as an accessory and conspiracy to fabricate physical evidence. The jury found the defendant not guilty of fabricating physical evidence. With respect to the extortion charges, the jury found the defendant guilty of conspiracy to commit larceny in the first degree by extortion and attempt to commit larceny in the first degree by extortion.

On July 6, 2010, the defendant filed a motion for a new trial, arguing, inter alia, that the court improperly joined the two cases for trial and denied his motion to sever. That same day, the defendant also filed a motion for a judgment of acquittal on the ground that there was insufficient evidence to support the jury's verdicts. The court denied the defendant's motions and rendered judgments in accordance with the verdicts. The court sentenced the defendant to a total effective term of ten years incarceration, suspended after three years, and three years of probation. This appeal followed.

I

The defendant first claims that the evidence was insufficient to support his convictions on both the bribery charges and the extortion charges.[9] With respect to the bribery charges, the defendant argues that there

---

[9] "We review the defendant's sufficiency of the evidence claim first because that claim, if successful, would necessitate the entry of a judgment of acquittal . . . . *State* v. *Murray*, 254 Conn. 472, 478, 757 A.2d 578 (2000)." (Internal quotation marks omitted.) *State* v. *Mourning*, 104 Conn. App. 262, 266 n.1, 934 A.2d 263, cert. denied, 285 Conn. 903, 938 A.2d 594 (2007); see also *State* v. *Monahan*, 125 Conn. App. 113, 118 n.7, 7 A.3d 404 (2010), cert. denied, 299 Conn. 926, 11 A.3d 152 (2011); *State* v. *Bereis*, 117 Conn. App. 360, 364, 978 A.2d 1122 (2009).

was insufficient evidence that (1) an official proceeding was about to be instituted, (2) the defendant intended to mislead a public servant, (3) the defendant aided Carlos Costa[10] in fabricating the invoice from USA Contractors, Inc. (USA Contractors), for renovations done at the defendant's residence, (4) the defendant and Costa agreed to fabricate the invoice from USA Contractors, and (5) the defendant accepted or solicited the renovation work on his home in consideration for aiding Costa in his dealings and disputes with the city as to his work on the Park Street revitalization project in Hartford (project). The defendant also argues that the evidence was insufficient to support his conviction of the extortion charges. Specifically, he contends that the state failed to establish that (1) he sought to compel Joseph Citino to pay $100,000 to Abraham Giles, (2) the defendant instilled a fear in Citino that if he failed to pay Giles, the defendant would impede Citino's renovation and development plans at the Davis Building lot, and (3) the defendant and Giles had an agreement to extort money from Citino. We are not persuaded by these claims of evidentiary insufficiency.

As an initial matter, we set forth the relevant legal principles and standard of review relating to a claim of insufficient evidence. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a

[10] At the time of his testimony at the defendant's trial, Costa had been charged with two counts of bribery and one count of tampering with physical evidence. Costa pleaded no contest to the charge of being an accessory to coercion in violation of General Statutes § 53a-192, and, on March 10, 2011, he was sentenced to one year, execution suspended, and one year conditional discharge.

reasonable doubt. . . . [I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Ovechka,* 292 Conn. 533, 540–41, 975 A.2d 1 (2009), aff'd after remand, 118 Conn. App. 733, 984 A.2d 796, cert. denied, 295 Conn. 905, 989 A.2d 120 (2010); see also *State* v. *Bennett,* 307 Conn. 758, 763, 59 A.3d 221 (2013).

"It is axiomatic that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Lindsay,* 143 Conn. App. 160, 166, 66 A.3d 944, cert. denied, 310 Conn. 910, 76 A.3d 626 (2013); *State* v. *Abreu,* 141 Conn. App. 1, 7, 60 A.3d 312, cert. denied, 308 Conn. 935, 66 A.3d 498 (2013); see also *State* v. *Calabrese,* 279 Conn. 393, 402, 902 A.2d 1044 (2006).

"[A reviewing court] cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . [P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible

by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Moore*, 141 Conn. App. 814, 818, 64 A.3d 787, cert. denied, 309 Conn. 908, 68 A.3d 663 (2013); see also *State* v. *Hedge*, 297 Conn. 621, 657, 1 A.3d 1051 (2010). Guided by these principles, we address the defendant's claims in turn.

A

We first address the defendant's claims of insufficient evidence with respect to the bribery charges. We begin by setting forth the facts, as reasonably found by the jury. In February, 2005, the defendant ordered from The Home Depot, among other items, a countertop and backsplash to remodel the kitchen at his residence. The order subsequently was canceled and, in March, 2005, the store refunded the money that had been paid.

At that same time, the defendant and his wife, Maria Perez, went to the showroom of Costa's business, USA Contractors. The defendant had known Costa for several years. The defendant and his wife informed Costa that they were looking for a new kitchen countertop. He showed the defendant and Maria Perez various samples of granite and informed them that they could view additional options at a wholesaler, International Granite and Marble. There was no discussion of the cost of purchasing and installing the new countertop. As a general matter, USA Contractors charged $45 per square foot, $55 per square foot or $65 per square foot depending on the quality of the granite selected by a customer. Other charges included between $100 and $150 per hole for a sink cutout and $10 per linear foot for a backsplash. In accordance with the industry standard,

Costa normally required customers to pay a 90 percent deposit prior to templating the countertop, with the balance due at installation.

After a style of granite was selected, one of Costa's employees went to the defendant's residence to take the necessary measurements to manufacture the countertop. The size of the countertop was 116 square feet, and the granite selected was $65 per square foot. The defendant never offered to pay Costa a deposit, and Costa never collected one for the defendant's order. The countertop then was installed in the defendant's kitchen in April, 2005. The defendant did not pay for the countertop following the installation.

While reviewing the installation of the countertop, Costa spoke with Maria Perez, and this conversation led to additional work at the defendant's residence. This included the installation of ceramic tile in the kitchen and a granite threshold between the kitchen and dining room. At the time this work was performed, Costa received no payment. More renovations followed, namely, combining two smaller bathrooms into one large one. This undertaking consisted of the following: removing a wall; installing new floor; repairing a wall; merging two doors; installing a steam shower, a whirlpool tub, toilets, a vanity, a vanity cabinet and Sheetrock; painting; and performing electrical work. The defendant did not pay for any of these items or labor at the time of the upstairs bathroom work. Finally, additional work in the defendant's residence included minor repairs and painting in a first floor bathroom. At the time of this work, the defendant did not pay for either the supplies or the labor. Throughout the work on his residence, which was completed by September, 2005, the defendant never asked about the cost. Furthermore, Costa never expected to be paid for his work; he just did it and "absorbed the cost." Costa specifically testified that doing the renovation at the defendant's

residence was part of the cost of doing business with the city.

At the time that Costa was remodeling the defendant's residence, he had been selected by the city to revitalize Park Street. The project involved street reconstruction, pavement reconstruction, repairs to the drainage system and aesthetic improvements, including decorative lighting, sidewalk treatment involving brick pavers, new curbing and other amenities. The project was funded primarily by the federal government and was valued at $7.3 million. USA Contractors, along with other qualified contractors, had bid on the project in 2003.[11] USA Contractors successfully bid approximately $5.3 million.[12] In October, 2004, John H. McGrane, employed by the city as the assistant director of public works and a city engineer, was assigned to oversee the project. As part of his duties, McGrane was responsible for ensuring that the project was progressing in a timely fashion, that the quality controls as set forth in the contract were implemented and that payments made on the project were correct and accurate. The work on the project had begun in the spring of 2004 and the contract allotted 300 calendar days, exclusive of the winter shutdown, for substantial completion and 330 calendar days, exclusive of the winter shutdown, for final completion.[13]

---

[11] The next closest bid was $1.3 million higher than USA Contractors.

[12] The federal government provided funding in the amount of $4.3 million. The city and the state Department of Transportation each contributed $500,000 to the project.

[13] McGrane testified as follows regarding the difference between substantial compliance and final completion: "Substantial completion generally means that the project, as implied, is substantially completed to the point where it's usable by the owner; however, there may be punch lists and other minor uncompleted items that have yet to be done. And final completion means that everything is done as specified on the plans and as detailed in any punch lists, exclusive of warranty items that may come up later."

McGrane also testified that the time period from December 1 through April 1 was excluded from the time to complete the project because this type of work generally was not permitted in the winter for quality reasons.

As McGrane started work in October, 2004, he immediately became aware of issues regarding the project; primarily, the fact that 30 to 40 percent of the time for final completion had run and the project was not 30 to 40 percent complete. Additionally, logistical and coordination problems with merchants and others on Park Street existed. Finally, McGrane noted that the city was not satisfied with the quality of certain aspects of the work, including the line and grade of the pavers.[14] To remedy these matters, the city sent several letters to Costa, addressing both the failure to adhere to the schedule and the poor quality of the work.[15] McGrane participated in meetings with Costa to resolve these issues. Costa submitted an updated schedule for the project, but McGrane rejected it because it called for a completion date of at least one year past that specified in the contract.

In the beginning of 2005, Costa submitted claims for extra payments due from the city. McGrane explained that if a contractor encountered conditions that were outside those contemplated by a contract, he or she is entitled to submit a written request for extra payment. Costa requested payments exceeding the $5.3 million contractually owed by the city. For example, in a summary report dated April 19, 2005, USA Contractors claimed that $273,246.72 was owed for work performed per the contract with the city but not appropriated for payment by the city's Department of Public Works, $27,487 was owed for work performed per the contract but underpaid by the Department of Public Works and

[14] There also were concerns that Costa had failed to comply with the requirement that 15 percent of the total contract value had to be subcontracted to minority or disadvantaged business enterprises.

[15] For example, in a letter dated January 27, 2005, McGrane informed Costa that the project was less than 30 percent complete, yet over 65 percent of the scheduled time had elapsed. McGrane also noted that if the project was not completed on schedule, Costa faced liquidated damages in the amount of $350 per calendar day.

$81,834.81 was owed for extra work as a result of unforeseen site conditions. The city agreed to pay approximately $41,000 for the first category of extra payments, approximately $3300 for the second and approximately $9000 for the third category.

Both prior to and after he began working on the defendant's residence, Costa had sought assistance from the defendant regarding jobs involving city work being performed by USA Contractors. After he performed the work at the defendant's residence, however, the defendant's responses to Costa were quicker, and the defendant provided Costa with access to Charles J. Crocini, the city's director of capital projects, "to help [him] diffuse some of the problems that [Costa] was having on [the project], due to the unforeseen conditions of construction . . . ."

Bhupen Patel, the city's director of public works, reported directly to the defendant. He was aware of the many extra claims submitted by Costa and did not question his staff's assessment that most of them did not require payment from the city. Contrary to normal procedure, Costa submitted the claims directly to the defendant's office instead of to the city's Department of Public Works. The defendant told Patel that he should review the claims again and suggested that there should be some merit to them. Patel also stated that the defendant "suggested that if [Costa's] making [claims] for $1.5 million, at least to—that there may be a legitimate claim for 50 percent or so."

Patel and his staff conducted a review of the claims and determined that most of them were unfounded. Patel informed the defendant of this. The defendant then suggested Crocini should review the claims submitted by Costa. Patel and Crocini decided to use a third party to review the continual extra claims submitted by Costa. The city previously had entered into a contract

with Urban Engineers, Inc. (Urban Engineers), and in early 2005, one of its tasks was to assist in responding to the voluminous paperwork from Costa and USA Contractors. Urban Engineers also provided construction management services for the project and acted as a liaison and coordinator between the city and Costa. The staff of Urban Engineers expressed concern over the slow progress and quality of USA Contractors' work.[16] In reviewing more claims for extra payment submitted by Costa, this time totaling approximately $350,000, Urban Engineers determined that only $50,000 to $60,000 appeared to have merit.

As part of its duties for the city, Urban Engineers came up with three alternative courses of action for the problems with the project. The first alternative proposed was to terminate the contract with USA Contractors, the second was to reduce the scope of USA Contractors' work on the project and rebid the remainder of the project, and the third was to rehabilitate the project. Urban Engineers provided the advantages and disadvantages of each alternative to the city, as well as a list of conditions USA Contractors had to meet if it were to remain on the project.

In January, 2006, Najib Habesch, Vincent Carita, and Jay Bertoli of Urban Engineers, and McGrane, Patel, John Rose, the city's corporation counsel, Mark Turcotte, the city's purchasing director, and Crocini held a meeting regarding the project and its issues. At this point, it was the consensus of all in attendance that the contract with USA Contractors would be terminated.

---

[16] Najib Habesch, a former employee of Urban Engineers, testified as follows with respect to the poor quality of work: "There were grates that weren't installed according to the proper elevation; there were crosswalks that were not being installed according to the design; there were issues with maintaining what was already put out there such as the trash cans that were either being lost, vandalized, hit; light poles that were being broken, quite a few issues."

They agreed further that USA Contractors' bonding company, U.S. Fidelity and Guarantee Corporation (U.S. Fidelity),[17] would be notified of the issues with the project and that Crocini would inform the defendant of the decision to terminate the contract. Crocini, who reported directly to the defendant, was responsible for construction projects outside the auspices of the city's Department of Public Works. Crocini's involvement in the project was unusual, and his role was to evaluate whether the Department of Public Works was treating Costa fairly.

In a letter dated May 8, 2006, McGrane wrote to U.S. Fidelity with copies sent to Patel, Rose, Crocini, Carita and Costa.[18] This letter served "to formally notify [U.S. Fidelity] of the continued failure of [USA Contractors] to perform under the terms of the above contract. It is clear that USA Contractors is in default of their contract, and the [city] needs to take action to remedy the situation in order to limit the damages we are incurring as a result of late completion of the project." The letter requested that U.S. Fidelity evaluate the options under the bond to remedy the situation, to meet with officials from the city to discuss the option and set forth a course of action.

Upon receiving his copy of this letter, Costa was "extremely disappointed" that it had been sent to U.S. Fidelity. He contacted his attorneys, the defendant and Crocini. He spoke with the defendant about the issues with the project. The defendant indicated that Crocini

---

[17] McGrane testified that "the bonding company is basically providing an assurance, financially, that the project gets complete and all the terms get met; it's like an insurance policy. So by putting the bonding company on notice, they very often can put pressure on a contractor to shape up and comply, because there are severe consequences to him from the bonding company if he does not do that."

[18] U.S. Fidelity never received McGrane's letter. The letter was returned to the city unopened in the original envelope as undeliverable.

was reviewing the matter with the Department of Public Works. Costa understood that McGrane's letter would be rescinded. Furthermore, on May 12, 2006, Crocini told Costa that all communications regarding the project should go through him. When Urban Engineers attempted to clarify the communication protocol in a May 17, 2006 telefax to Costa, he rejected this arrangement and indicated that he had spoken with Crocini and that all communication from USA Contractors would go through Crocini's office.

A few days later, Patel received a telephone call informing him that the defendant wanted to see him. He walked into the defendant's office with Crocini. The defendant, holding Costa's copy of McGrane's letter to U.S. Fidelity, appeared angry, and asked: "What the fuck is going on?" Crocini said that he would "take care of it" by letting U.S. Fidelity know that McGrane's letter was merely a "warning" and not a request to call the bond. Crocini wrote a letter, dated May 16, 2006, which provided in relevant part: "The intent of [McGrane's May 8, 2006 letter] was to serve a notice, only, to the bonding company, and there is no wish, at this time, to execute any action against the contractor, [USA Contractors]. It is the intent of the [city] to work with [USA Contractors] to ensure a successful and complete project for the [city]. . . . If in the future, if there are any additional problems or concerns regarding this project and the performance of [USA Contractors], a formal request for bond action will be presented to [U.S. Fidelity]."

Crocini's letter effectively rescinded McGrane's letter to U.S. Fidelity and came as a surprise to McGrane.[19]

---

[19] Prior to writing this letter, Crocini met with McGrane and informed him that the defendant was "displeased that the [May 8, 2006] letter had been sent and that [the defendant] wanted it retrieved . . . ." Crocini also asked for contact information for U.S. Fidelity and told McGrane that the defendant did not want U.S. Fidelity to take over the project; rather, the defendant's preference was to have the issues with USA Contractors settled and to have

The Crocini letter also was contrary to the decision of the Department of Public Works and the opinion of Urban Engineers. U.S. Fidelity never took any action with respect to USA Contractors' performance. The city deemed the project to be complete in February, 2008, approximately two and one-half years late. In total, USA Contractors requested approximately $2 million in extra payments, of which the city approved approximately $300,000.

The normal procedures for paying vendors of the city consisted of mailing payment within thirty days of receipt of the invoice. Upon a written request, however, this process could be expedited. Kathleen Palm-Devine, the treasurer of the city since January, 1999, and whose responsibilities of this elected position included issuing all checks to vendors of the city and managing the city's temporary idle cash, testified that this expedited procedure caused a disruption in the work flow of the employees in her office. Additionally, when an emergency check was picked up rather than mailed, the city lost interest income. On several occasions, members of the defendant's staff requested expedited checks for payment to USA Contractors.

In February, 2006, Joaquim "Jack" Espirito Santo, the owner of a furniture store in Hartford, learned that work was being performed on the bathroom and kitchen of the defendant's residence, and that it did not appear that the defendant was paying for this. Santo started to discuss this matter with friends a few weeks later. The defendant was cognizant of rumors in the community that work had been done on his residence by Costa. In the late summer or early fall of 2006, the defendant requested Costa to develop a bill for the work done at his residence. Costa informed the defendant that his

that company continue on. Last, the defendant wanted to transfer a "bucket of money" into the project to settle the claims submitted by Costa's company.

bill would be "between mid to high [$20,000s]." The defendant appeared shocked that the bill would be so high. Costa estimated, however, that he had performed $40,000 worth of work. Because he had not thought he would ever be preparing a bill for the defendant, Costa had not kept records of the work.

In early 2007, Santo informed Frank Barrows and Minnie Gonzalez about Costa's work at the defendant's residence. Both Barrows and Gonzalez, political opponents of the defendant, were running against him in the 2007 mayoral election. Costa prepared a bill, dated February 28, 2007, totaling $20,217.[20] He attached various receipts from vendors. He acknowledged, however, that the bill did not accurately charge the defendant for all of the work done.

Michael Sullivan, an inspector with the state Division of Criminal Justice in its public integrity unit, commenced an investigation following a newspaper article in the Hartford Courant.[21] Additionally, the defendant had written a letter to the chief state's attorney requesting his office to investigate possible criminal activities unrelated to the project or Costa.[22] Sullivan

---

[20] The first page of the bill created by Costa provided: "Please review this bill for all work completed at [the defendant's residence].

| "Kitchen Countertop | $2,385.00 |
| "1 Bathroom cabinet | $371.00 |
| "1 Shower Door | $1,774.63 |
| "1 Tile installation | $750.00 |
| "1 Tile materials | $1,234.80 |
| "1 Grout & miscellaneous | $88.21 |
| "1 Home Depot | $1,681.68 |
| "1 Metcaf Glass | $408.02 |
| "1 Plimpton & Hills | $5,762.47 |
| "1 Donald Sullivan | $2,862.00 |
| "1 Lump sum labor | $2,900.00 |
| "Overall Total | $20,217.00" |

[21] Sullivan testified that he was a sworn law enforcement officer and that his duties included investigating allegations of criminal activity.

[22] See footnote 33 of this opinion for the text of the letter sent by the defendant to the chief state's attorney.

made an appointment and interviewed the defendant in his office on June, 27, 2007.[23] After discussing other matters with the defendant, Sullivan, on the basis of general information he had received the day before, asked the defendant if he had had any renovation work done at his residence by USA Contractors. The defendant replied that it had performed work on his bathroom, vanities and countertops. The defendant also indicated that he had paid for this work.

After Sullivan turned his questions to the issue of work done by USA Contractors at the defendant's residence, the defendant's demeanor changed. Sullivan explained: "Then [the defendant] was noticeably nervous, shaking, considerably sweating, he couldn't sit in his chair, he was up and down fidgeting, scratching, touching every part of his body, his voice dropped." The defendant told Sullivan that he had paid USA Contractors by a check approximately one and one-half years earlier and that he had paid market price. The defendant told Sullivan that he did not have a written contract with USA Contractors and that he would provide Sullivan with a copy of his check.

The next day, the defendant went to the Hartford Federal Credit Union (credit union) for the purpose of applying for a home equity loan. Specifically, he requested a loan in the amount of $25,000 to pay for home improvements and consolidation of personal debts. The defendant dated the application for June 26, 2007, but his wife, as co-borrower, correctly indicated the date as June 27, 2007. The credit union approved the defendant's loan application and issued a check, dated July 11, 2007, to USA Contractors in the amount of $20,217. Following a meeting on July 6, 2007, the defendant provided Sullivan with a copy of a bill from

---

[23] Sullivan recorded this interview and the relevant portions were played for the jury.

USA Contractors, a copy of his loan application to the credit union and paperwork and receipts from The Home Depot.

### 1

The defendant argues that there was insufficient evidence to support his conviction of fabricating evidence as an accessory and conspiracy to fabricate evidence.[24] Before addressing the defendant's arguments, we first set forth the relevant statutory language of § 53a-155 (a): "A person is guilty of tampering with or fabricating physical evidence if, believing that an official proceeding is pending, or about to be instituted, he: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceeding; or (2) makes, presents or uses any record, document or thing knowing it to be false and with purpose to mislead a public servant who is or may be engaged in such official proceeding." Accordingly, the state must establish, beyond a reasonable doubt, that "the defendant (1) believed that an official proceeding was pending, (2) presented or used the [evidence] knowing it to be false and (3) did so with the purpose of misleading a public servant." *State* v. *Widlak*, 85 Conn. App. 84, 89–90, 856 A.2d 446 (2004). Furthermore, this court has stated that "[t]he statute making criminal the fabricating of evidence is found in part XI of our Penal Code, which addresses offenses against the administration of justice. Statutes found in that section address crimes that effect a fraud or harm to the court. The purpose of those statutes is to punish those who

---

[24] We have stated that "there is no practical significance in being labeled an accessory or a principal for the purpose of determining criminal responsibility and that [t]here is no such crime as being an accessory . . . . The accessory statute merely provides alternate means by which a substantive crime may be committed." (Internal quotation marks omitted.) *State* v. *Gamble*, 119 Conn. App. 287, 297, 987 A.2d 1049, cert. denied, 295 Conn. 915, 990 A.2d 867 (2010).

interfere with the courts and our system of justice." *State* v. *Servello*, 80 Conn. App. 313, 323, 835 A.2d 102 (2003), cert. denied, 267 Conn. 914, 841 A.2d 220 (2004).

The defendant first contends that there was insufficient evidence that an official proceeding was about to be instituted when the bill was created. Specifically, he points to Costa's testimony that he requested a bill in the fall of 2006 for the· work done at his residence. Costa did not provide the defendant with the bill until February, 2007. Sullivan's investigation into the work at the defendant's residence did not commence until later that year.

Our analysis is guided by our Supreme Court's decision in *State* v. *Foreshaw*, 214 Conn. 540, 572 A.2d 1006 (1990). In that case, the defendant shot and killed the victim, and then fled in her automobile. A short time later, the police located and arrested the defendant. Id., 543. Between the shooting and the arrest, the defendant had thrown the gun out the window of her automobile, and it never was recovered. Id. The state charged the defendant with, inter alia, tampering with physical evidence in violation of § 53a-155 (a) (1). Id., 549. The defendant argued on appeal that the evidence was insufficient to sustain her conviction on that charge because, at the time she discarded the gun, she had had no contact with the police or the judicial system, and thus "she could not have believed an official proceeding was about to be instituted." (Internal quotation marks omitted.) Id., 550. Our Supreme Court rejected this argument. "The statute, however, speaks to that which is readily apt to come into existence or be contemplated and thus plainly applies to the official proceeding arising out of such an incident." Id., 551.[25] In other words,

---

[25] We are cognizant of the following question certified by our Supreme Court in *State* v. *Jordan*, 305 Conn. 918, 47 A.3d 388 (2012): "Should this court overrule its construction of General Statutes § 53a-155 in *State* v. *Foreshaw*, 214 Conn. 540, 572 A.2d 1006 (1990)?" At this time, however, we are bound to follow *Foreshaw*, the controlling precedent from our Supreme Court.

§ 53a-155 does not require a temporal proximity between the alleged act and the subsequent official proceeding. See, e.g., *State* v. *Pommer*, 110 Conn. App. 608, 617–18, 955 A.2d 637, cert. denied, 289 Conn. 951, 961 A.2d 418 (2008); see also *State* v. *Foreshaw*, supra, 551.

Applying the law to the facts of this case, we conclude that there was sufficient evidence to support the jury's finding of this element of fabricating physical evidence. In *Pommer*, we noted that our "Supreme Court concluded that the official proceeding is pending, or about to be instituted element of § 53a-155 (a) could be satisfied when the facts support the inference that the defendant reasonably could have contemplated that an official proceeding was likely to arise." (Internal quotation marks omitted.) *State* v. *Pommer*, supra, 110 Conn. App. 618; see also *State* v. *Foreshaw*, supra, 214 Conn. 551. In the present case, the evidence was sufficient to support the jury's finding that the defendant reasonably could have contemplated that an official proceeding was likely to arise. Costa testified that in the summer or fall of 2006, the defendant instructed him to create a bill for the work done at his residence. At that time, the defendant had learned of rumors in the community regarding Costa's work on his residence. It was within the province of the jury to find that the defendant, the mayor of Hartford since December, 2001, had requested the creation of the bill because he believed that an official proceeding would be instituted on the basis of the rumors, i.e., work being done on the home of an elected city official by a contractor who had pending business with the city.

The defendant next contends that there was insufficient evidence that he aided Costa in creating the bill. Specifically, the defendant claims that the evidence showed only that Costa took it upon himself to lower the bill and that the defendant never knew the true

value of the work being done on his residence. We are not persuaded.

The jury could view the evidence to find that neither Costa nor the defendant ever intended for the bill to exist. The defendant never received a price quote for the work, nor inquired about paying for all of the work done on his residence, even as the project expanded to the upstairs bathroom. Only upon learning of the rumors in the community did the defendant ask Costa to develop a bill. The bill, on its face, did not include all of the work done at the defendant's residence. Further, when Costa indicated that the bill would be in "the mid to high twenty" thousand dollars, the defendant expressed surprise and subsequently received a bill of $20,217. On the basis of this evidence, there was sufficient evidence to support the jury's finding that the defendant aided in the fabrication of the bill.

Last, the defendant contends that there was no evidence that he and Costa agreed to fabricate the bill. This contention pertains to the conspiracy to fabricate evidence charge. "To establish the crime of conspiracy under § 53a-48 of the General Statutes, the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed. The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act." (Internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 181–82, 869 A.2d 192 (2005). "[I]t is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words we have an agreement. . . . [A] conspiracy can be inferred from the conduct

of the accused . . . and his coconspirator, as well as from the circumstances presented as evidence in the case." (Citation omitted; internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 227, 733 A.2d 156 (1999). The evidence that supported the finding that Costa aided in fabricating the bill also supported the jury's finding that the defendant had conspired to enter into such an agreement.

2

The defendant next argues that there was insufficient evidence to support his conviction of receiving a bribe.[26] Stated broadly, the defendant contends that there was no evidence that he solicited or accepted discounted work on his home from Costa in exchange for providing Costa with assistance on the project. We are not persuaded.

We begin by setting forth the statutory language. Section 53a-148 (a) provides: "A public servant or a person selected to be a public servant is guilty of bribe receiving if he solicits, accepts or agrees to accept from another person any benefit for, because of, or as consideration for his decision, opinion, recommendation or vote." Simply put, "[a] public servant is guilty of bribe receiving . . . if he [accepts, agrees to accept or] solicits a benefit as consideration for his decision, opinion, recommendation or vote." *State* v. *Fox*, 22 Conn. App. 449, 456, 577 A.2d 1111 (1990); see also *State* v. *Bergin*, 214 Conn. 657, 668, 574 A.2d 164 (1990).

The defendant's argument is focused on the issue of whether he assisted Costa by way of a decision, opinion, recommendation or vote. His appellate brief presents his view and interpretation of the evidence. Our scope

---

[26] We note that our Supreme Court has described bribery as "a crime that involves a violation of the public's trust in our elected officials . . . ." *State* v. *Bergin*, 214 Conn. 657, 662, 574 A.2d 164 (1990). It also stated that the crime of bribery "may occur subtly over a period of time." Id., 675.

of review, however, is not whether a reasonable view supports his claim of innocence; rather, it is whether there is a reasonable view that supports the jury's finding of guilt. *State* v. *Moore*, supra, 141 Conn. App. 818.

After starting work on the defendant's residence, Costa noted that he received assistance related to the project more quickly from the defendant than he had in the past. Contrary to normal procedures, Costa submitted his claims for extra payments to the defendant's office. The defendant then requested Patel to review the claims and suggested that 50 percent may have had a legitimate basis. The defendant also assigned Crocini to help Costa in a project controlled by the city's Department of Public Works. After Costa received a copy of McGrane's letter to U.S. Fidelity, he met with the defendant, who said he was reviewing the matter. Shortly thereafter, Patel had a meeting with the defendant and Crocini. Holding a copy of that letter that he had received from Costa, the defendant appeared angry. This led to Crocini's writing a letter to U.S. Fidelity, which effectively rescinded McGrane's letter and was contrary to the decision of the Department of Public Works to terminate USA Contractors and to involve U.S. Fidelity in the project. Both of these events would have had serious repercussions for Costa and USA Contractors. The jury also heard evidence that the defendant helped expedite payments from the city to USA Contractors. Costa thereby received the benefit of receiving payment sooner than he would have through the city's normal course of operations. In short, we conclude that the evidence supported the jury's finding with respect to the charge of receiving a bribe in violation of § 53a-148 (a).

### B

We now address the defendant's sufficiency claim with respect to the extortion charges. The jury reasonably could have found the following facts. Joseph Citino, a general contractor and property developer,

owned a construction company known as Providian Builders of Connecticut. Part of his business included looking for properties to develop in the city. He found an old, vacant, and blighted property located at 1161 Main Street that was for sale. The building located on this property was known alternatively as the "Davis building" and "the butt ugly building." Citino performed some preliminary research on this property, including the sale price and its permitted uses. Citino intended to tear down the existing building and construct residential condominiums with retail space on the lower level. Citino also needed to purchase property located at 1143 Main Street so that 1161 Main Street was not landlocked.[27]

The property at 1161 Main Street was owned by the Edwards Development Company. After negotiations, Citino signed a purchase and sale agreement to buy 1161 Main Street.[28] The initial sale price was $1.3 million, but subsequent negotiations lowered the price to approximately $1,150,000. The purchase was contingent on Citino's ability to purchase 1143 Main Street from the city.

Citino, through his construction firm, contacted John Palmieri, the city's director of development, about the plans to develop 1161 Main Street and his interest in purchasing 1143 Main Street in late January, 2006. At that time, 1143 Main Street was being used as a parking lot. Citino attended a meeting with Palmieri and Matthew Hennessy, the defendant's chief of staff, to present concept drawings for the two properties on Main Street. Palmieri asked Citino to send a letter directly to the

---

[27] During the trial, the parcel of property also was described as 1155 Main Street. For convenience and consistency, we refer to this parcel as 1143 Main Street.

[28] Jon Concilio testified that he had been employed as a sales representative by Chozick Realty in Hartford and that it had listed the property "[o]n and off for probably a year and a half to two years . . . ."

defendant setting forth his intentions and the need to purchase 1143 Main Street. Citino did so in late February, 2006.[29]

In May, 2006, Citino attended a meeting with the defendant, and others, where they discussed various options for the redevelopment of 1161 Main Street. At the meeting, the following were topics of discussion: (1) why Citino wanted to purchase the properties; (2) what Citino was going build on 1161 Main Street; (3) the defendant's assurance that Citino had an agreement in place to purchase 1161 Main Street before the city sold 1143 Main Street to Citino; and (4) the needs of Abraham Giles, the parking lot operator at 1143 Main Street.[30] The defendant also implied that Giles had a lease with the city with respect to 1143 Main Street.[31] At the end of the meeting, Citino inquired what the next step for the redevelopment was and the defendant replied: "[F]irst, we got to take care of [Giles] or there is no next step." Citino understood this to mean that if an arrangement with Giles did not occur, then he would not be able to redevelop 1161 and 1143 Main Street.

Giles had been active in city politics since the 1940s. His occupation was operating a parking lot business. In 2006, as the 2007 mayoral election approached, the members of the Hartford Democratic Town Committee,

---

[29] See footnote 1 of this opinion, describing the power of the defendant in the strong-mayor form of municipal government.

[30] This parking lot was not paved or lighted and lacked curbs and drainage. In this condition, it did not meet the city's standards, and Citino's request for permission to have it "grandfathered" was denied; therefore, improvements were necessary.

[31] During redirect examination, Citino testified as follows: "The conversation that took place during the meeting, whereby it was conveyed to me that this person [Giles] had either an existing long-term lease—I think the term, for twenty years, was thrown out there, and I didn't know if that was twenty years prior or twenty years into the future, but there was mention of there being a lease."

which is divided into districts, began the process of endorsing a candidate. Securing the committee's nomination is often crucial to a candidate's being elected in the city, due to the high percentage of Democratic voters. Although Giles previously had backed other candidates opposing the defendant, at some point in late 2005, or early 2006, he supported the defendant.

Citino, who did not know Giles, arranged a meeting with him.[32] This meeting occurred between May 23, 2006, and July 18, 2006. Giles informed Citino that he was "very close" to the defendant and that he "could help make or break" the deal to redevelop 1161 and 1143 Main Street. Giles made several requests, including that he be awarded the right to operate a parking lot after Citino had purchased the properties and the new building had been completed. Giles also sought monthly payments from Citino of $3000 to $4000 per month during the construction, a time period of approximately twenty-four months. These terms were unacceptable to Citino, who eventually asked Giles how much money it would take for him to vacate 1143 Main Street. Citino offered a one time payment of $25,000, and Giles responded with a counteroffer of $250,000. After negotiations lasting for approximately one week, Citino and Giles agreed on a payment of $100,000.

Citino attended a meeting with the defendant in July, 2006. He informed the defendant that the four conditions discussed at their earlier meeting had been met, including "tak[ing] care" of Giles. He specifically told the defendant about the agreement that he had reached with Giles, namely, the payment of $100,000 to Giles for vacating the parking lot at 1143 Main Street. In fact, the payment, described as a lease termination fee, was

---

[32] Jon Concilio, the sales representative for Chozick Realty in Hartford, testified that he performed an Internet search to find a way to reach Giles, and that he set up the meeting with Giles on Citino's behalf.

included as an addendum to the purchase of the building at 1161 Main Street.

At some point, Citino learned that Giles did not have a lease with the city for 1143 Main Street and decided that he would not pay the $100,000 to Giles. He informed the city's corporation counsel that he would not make the payment, and that it would be the city's responsibility to remove Giles from 1143 Main Street. He was told that the city would not get involved in the agreement between Citino and Giles.

As the costs for this redevelopment escalated, Citino began to have concerns regarding its viability, and contacted the defendant in February or March, 2007. In a March 5, 2007 e-mail to the defendant, Citino detailed the various issues with the redevelopment project, such as asbestos abatement and other expenses. Citino then stated: "I made an agreement with the parking operator who presently leases the city owned parcel [Giles] and for a sum of $100,000, he has agreed to vacate the property on the day we are having our real estate closing." A few hours later, the defendant attempted to reach Citino by telephone five or six times.

On March 16, 2007, the defendant and Citino spoke on the telephone. At some point, the defendant, referring to Citino's March 5, 2007 e-mail, stated that he wished Citino had not put the reference of the payment to Giles in writing. Citino offered to delete the e-mail, and the defendant responded that "it couldn't be deleted because it was part of the computer's hard drive or permanent record." The defendant also expressed a concern that if the e-mail got into the "wrong hands" it would not "look good." The defendant agreed to find some funds to help with the rising asbestos abatement costs and to reduce the sale price of 1143 Main Street from approximately $56,000, as set by the Hartford City Council in November, 2006, to $1. A few days later,

Citino received an e-mail from the city's assistant corporation counsel, Ben Bare, indicating that the city would contribute $80,000 toward the asbestos removal costs and sell 1143 Main Street to Citino for $1. The defendant indicated that Citino was no longer required to make the payment to Giles.

In April, 2007, Citino received a telephone call from a newspaper reporter asking him to respond to the fact that the Main Street redevelopment deal had collapsed. The reporter told Citino that the defendant previously had denied knowledge of the condition requiring Citino to make a $100,000 payment to Giles for him to vacate 1143 Main Street. Thereafter, the plans for the redevelopment project at 1161 and 1143 Main Street ended. In a letter dated April 23, 2007, the defendant requested that the chief state's attorney determine whether any party had violated the law with respect to "two parcels of land on Main Street," including one owned by the city.[33]

---

[33] The defendant's letter to the chief state's attorney stated: "I am writing to request the assistance of your . . . office to determine if any person violated the law in connection with a failed redevelopment effort of two parcels of land on Main Street in Hartford, one of which is city owned. It has come to my attention that a provision for a $100,000 'termination fee' payable to the operator of a parking lot on city owned property was included in a purchase and sale agreement between Joseph Citino of Providian Builders of Hartford and Edwards Development LLC of Miami Beach, Florida for the purchase of 1161 Main Street, a privately owned parcel.

"Though private parties are free to include any provisions they desire in private sales of land, the city owned parcel was to be transferred to Providian Builders pursuant [to] terms set by the city council, which did not include provisions for the purchaser to pay a 'termination fee' as a condition of purchasing the parcel. The city has decided to not proceed with the sale of its parcel, as Providian Builders has been unable to meet the city's condition for sale which include the demolition of a blighted building located at 1161 Main Street and the timely execution of a purchase and sale agreement with the city. However, I am concerned even though no city money or land was transferred, that one or more individuals may have intended to use city funds from the project to unjustly enrich one or more parties.

"I would appreciate your assistance to determine if any party may have violated the Connecticut General Statutes in connection with this failed transaction. The resources of the city will be at your disposal and I look forward to your response."

When he learned about this letter from a reporter, Citino questioned the defendant's motives.[34]

The defendant argues that there was insufficient evidence to support his conviction of conspiracy to commit larceny by extortion or attempt to commit larceny by extortion. We begin by setting forth the relevant statutory language for the underlying substantive offense of larceny by extortion. Section 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to . . . (5) Extortion. A person obtains property by extortion when he compels or induces another person to deliver such property to himself or a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will . . . (H) use or abuse his position as a public servant by performing some act within or related to his official duties, or by failing or refusing to perform an official duty, in such manner as to affect some person adversely . . . ."

Next, we restate the elements of conspiracy. "[Section] 53a-48 (a) provides in relevant part that [a] person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. Therefore, a conspiracy also consists of two essential elements: (1) a

---

[34] Specifically, Citino testified: "I actually thought that that was a very, very underhanded, spineless move, because why would anyone try to have me investigated for something that was a perfectly legitimate deal, unless he knew that it wasn't legitimate and he got his hand caught in the cookie jar. Because there was no reason to send that out and have me investigated. He wasn't concerned about my reputation, the way I was being portrayed in the newspaper. He wasn't concerned with my family's well-being. He was concerned about his you know what."

specific agreement to engage in or cause the performance of conduct constituting a crime and (2) an overt act in pursuance of that agreement." (Internal quotation marks omitted.) *State* v. *Lokting*, 128 Conn. App. 234, 239, 16 A.3d 793, cert. denied, 301 Conn. 926, 22 A.3d 1277 (2011); see also *State* v. *Padua*, supra, 273 Conn. 167–68. Additionally, we note that "[w]hile the state must prove an agreement, the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." (Internal quotation marks omitted.) *State* v. *Leggett*, 94 Conn. App. 392, 399, 892 A.2d 1000, cert. denied, 278 Conn. 911, 899 A.2d 39 (2006).

Last, we identify the elements of criminal attempt. Section 53a-49 (a) provides that "[a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." We have stated: "Both § 53a-49 (a) (1) and (2) require that the state prove both intent and conduct to sustain a conviction. . . . There are two essential elements of an attempt under this statute. They are, first, that the defendant had a specific intent to commit the crime as charged, and, second, that he did some overt act adapted and intended to effectuate that intent. . . .

[T]he attempt is complete and punishable, when an act is done with intent to commit the crime, which is adapted to the perpetration of it, whether the purpose fails by reason of interruption . . . or for other extrinsic cause." (Citations omitted; internal quotation marks omitted.) *State* v. *Torres*, 47 Conn. App. 205, 220, 703 A.2d 1164 (1997). Thus, the state was required to prove that the defendant, acting with the required mental state for larceny, intentionally performed an act constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. See *State* v. *Brown*, 33 Conn. App. 339, 350, 635 A.2d 861 (1993), rev'd in part on other grounds, 232 Conn. 431, 656 A.2d 997, superseded on other grounds, 235 Conn. 502, 668 A.2d 1288 (1995) (en banc).

1

The defendant first contends that the state failed to establish that he sought to compel Citino to pay Giles $100,000 to vacate the parking lot at 1143 Main Street. We are not persuaded. Citino testified that, at the May, 2006 meeting where he first presented his redevelopment plans to the defendant, after he inquired about his "next step," the defendant responded: "[W]ell, first we got to take care of . . . Giles or there is no next step." The defendant's appellate brief challenges Citino's credibility by comparing this testimony to Citino's grand jury testimony[35] and noting that Citino admitted to testifying untruthfully in his prior trial for counterfeiting. Neither of these arguments, however, precluded the jury from finding that the defendant compelled Citino to make the payment to Giles. As this court has noted, "[q]uestions of whether to believe or to disbelieve a competent witness are beyond our review. As

[35] Citino stated to the grand jury that the defendant had told him "something to [the] effect" that Giles had to be taken care of "before we could move forward." He also testified that his statements "mean[t] the same thing."

a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *McCarthy*, 105 Conn. App. 596, 605, 939 A.2d 1195, cert. denied, 286 Conn. 913, 944 A.2d 983 (2008). Because the jury was free to credit Citino's testimony, we cannot say that the evidence was insufficient with respect to this element of larceny by extortion.

### 2

The defendant next contends that there was insufficient evidence that Citino was in fear that the defendant would not assist him with the deal to redevelop 1161 Main Street if Citino did not pay Giles. The state counters that because the defendant was charged only with the inchoate offenses of attempt to commit larceny by extortion and conspiracy to commit larceny by extortion, the defendant's contention is irrelevant. We agree with the state. As this court noted in *State* v. *Lynch*, 21 Conn. App. 386, 403, 574 A.2d 230, cert. denied, 216 Conn. 806, 580 A.2d 63 (1990): "This argument cannot succeed because it fails to recognize the distinction between the actual commission of a crime and an attempt or a conspiracy to commit that crime." Simply put, the jury was not required to find that Citino feared that the defendant would use his position as an elected official to adversely affect him in order to find the defendant guilty of the inchoate crimes of conspiracy to commit larceny by extortion or attempt to commit larceny by extortion.

### 3

Finally, the defendant argues that there was no agreement between the defendant and Giles to engage in criminal conduct. Specifically, he claims that there

was nothing "nefarious" about the defendant's request for Citino to arrange a plan for Giles to vacate the property at 1143 Main Street. The state counters that this was a question for the jury and that there was sufficient evidence to support a finding of an agreement to engage in criminal conduct. We agree with the state.

The jury heard evidence regarding the political relationship between Giles and the defendant and how Giles supported the defendant's bid for re-election after previously supporting other candidates. The defendant implied to Citino that there was a lease between Giles and the city and that Citino had to take care of Giles or there would be no next step for the development. Additionally, Giles stated that he was "very close to the [defendant] and that he could help make or break this deal." The defendant expressed concern that Citino had memorialized the need for the payment to Giles in an e-mail and expressed a concern that it "wouldn't look good" if someone else obtained a copy of it. In interpreting the evidence, the jury could conclude that the reason for the defendant's concern regarding Citino's e-mail was based on the agreement to engage in criminal conduct. After reviewing the record and applying our deferential standard of review, we conclude that the jury's finding of guilt with respect to extortion charges was based on sufficient evidence.

II

The defendant next claims that the court improperly consolidated the bribery and extortion cases for trial, and then improperly failed to sever them, depriving him of his federal and state constitutional rights to a fair trial.[36] The defendant presents two related arguments

[36] Specifically, the defendant argues that the joinder of and failure to sever the two cases violated the fifth, sixth and fourteenth amendments to the United States constitution and article first, §§ 8 and 9, of the Connecticut constitution. The defendant's brief expressly states: "It should be noted that defense counsel is not raising a separate state constitutional claim."

with respect to this claim. The defendant first argues that he suffered substantial prejudice as a result of the court's erroneous application of the multifaceted test set forth in *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987), and that this error was not harmless pursuant to *State* v. *Payne*, 303 Conn. 538, 34 A.3d 370 (2012). Additionally, the defendant contends that the court's denial of his motion to sever improperly compromised his choice to testify in the bribery case and not the extortion case. See *State* v. *Schroff*, 198 Conn. 405, 503 A.2d 167 (1986). We agree with both of the defendant's arguments, and, accordingly, conclude that he is entitled to new, separate trials.

The following additional facts and procedural history are relevant to our discussion. On September 10, 2009, the state filed a motion to consolidate the two cases pursuant to Practice Book § 41-19.[37] The state argued that (1) joinder would foster judicial economy and administration, (2) the charges involved discrete and easily distinguishable fact patterns, (3) the crimes charged were not brutal or violent in nature, (4) the presentation of the evidence in an orderly manner would contribute to the distinguishable nature of the crimes charged in each docket, and (5) the court's instructions would result in the jury's ability to consider the bribery charges separately from the extortion charges. On November 2, 2009, the defendant filed an objection to the state's motion to consolidate.[38] He argued that judicial economy would not be served by joinder, he would suffer substantial prejudice because the evidence from one docket would not be admissible

---

[37] Practice Book § 41-19 provides: "The judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together."

[38] By filing his objection to the state's motion to consolidate, the defendant preserved the issue for appellate review. See *State* v. *LaFleur*, 307 Conn. 115, 154 n.31, 51 A.3d 1048 (2012).

in the other, and the complexity of the extortion charges, if joined with the bribery charges, would prejudice him in the eyes of the jury in the same manner as brutal or violent crimes "can blur the lines between joined cases . . . ." On November 4, 2009, the court held a hearing and granted the state's motion. During the remainder of the proceedings, the court denied the defendant's repeated requests to sever the two cases that had been joined.[39]

We begin our discussion by setting forth certain legal principles that inform our analysis. We have recognized the benefits of joining two criminal cases involving the same defendant. "A joint trial expedites the administration of justice, reduces congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who otherwise would be called to testify only once." (Internal quotation marks omitted.) *State* v. *Wilson*, 142 Conn. App. 793, 799–800, 64 A.3d 846, cert. denied, 309 Conn. 917, 70 A.3d 40 (2013). Courts and commentators, however, have long recognized the tension between these advantages[40] and the defendant's right to a fair

[39] On May 12, 2010, after the court had made its initial remarks and read the informations to the jury, the defendant moved for a mistrial, arguing that the jury had been prejudiced by hearing details about both the bribery and extortion cases. The court denied this motion. On May 18, 2010, the defendant alerted the court and the prosecutor that he would be moving to sever the cases after the state had completed its evidence in the bribery case. On May 20, 2010, the defendant filed a motion to sever the two cases. The court heard argument that day and denied the defendant's motion. On June 9, 2010, the defendant filed another motion for a severance, which was argued on June 11, 2010, and denied as well. The defendant orally renewed his request for severance on June 15, 2010; the court denied the motion.

[40] Our Supreme Court expressly has questioned the extent of the benefits of joinder in cases such as the present appeal. "[T]here is legitimate debate about whether the interests favoring joinder should be weighed differently when both the offenses are not legally related and the evidence is not cross admissible. As one treatise has observed: The argument for joinder is most persuasive when the offenses are based upon the same act or criminal

trial. See *State* v. *Davis*, 286 Conn. 17, 42–43, 942 A.2d 373 (2008) (*Katz, J.*, concurring) (commentators generally critical of joinder in absence of cross admissibility of evidence); *State* v. *Herring*, 210 Conn. 78, 95, 554 A.2d 686 (noting undeniable tension between need to conserve judicial resources by consolidation and defendant's right to fair trial), cert. denied, 494 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989); 5 W. LaFave et al., Criminal Procedure (5th Ed. 2007) § 17.1 (b), p. 9; C. Whitebread & C. Slobogin, Criminal Procedure An Analysis of Cases and Concepts (5th Ed. 2008) § 21.04, pp. 610–14; J. Farrin, "Rethinking Criminal Joinder: An Analysis of the Empirical Research and Its Implications for Justice," 52 Law & Contemp. Probs. 325, 332–33 (1989). Mindful of this background, we turn to the specifics of the defendant's appeal.

A

The defendant first argues that the court improperly applied the multipart test of *State* v. *Boscarino*, supra, 204 Conn. 714. Specifically, he contends that the first

transaction, since it seems unduly inefficient to require the state to resolve the same issues at numerous trials. Commentators have been generally critical, however, of the joinder of offenses which are unrelated, since the need to prove each offense with separate evidence and witnesses eliminates any real savings in time or efficiency which might otherwise be provided by a single trial. A. Spinella, Connecticut Criminal Procedure (1985) p. 416. As the Fourth Circuit Court of Appeals has noted as a general matter: [A]lthough it is true that the [f]ederal [r]ules of [c]riminal [p]rocedure [were] designed to promote economy and efficiency and to avoid a multiplicity of trials . . . we are of the strong opinion that the consideration of one's constitutional right to a fair trial cannot be reduced to a cost/benefit analysis. Thus, while we are concerned with judicial economy and efficiency, our overriding concern in an instance such as this is that [the] jury consider only relevant and competent evidence bearing on the issue of guilt or innocence for each individually charged crime separately and distinctly from the other. . . . *United States* v. *Isom*, 138 Fed. Appx. 574, 581 (4th Cir. 2005), cert. denied, 546 U.S. 1124, 126 S. Ct. 1103, 163 L. Ed. 2d 915 (2006)." (Internal quotation marks omitted.) *State* v. *Gupta*, 297 Conn. 211, 231–32 n.13, 998 A.2d 1085 (2010).

and third *Boscarino* factors support his claim of substantial prejudice as a result of the consolidation of the bribery and the extortion charges. He further claims that this improper joinder resulted in harmful error, warranting new trials. We agree.

We analyze the joinder and failure to sever issue under the principles set forth in *State* v. *Payne*, supra, 303 Conn. 538, which was decided after the defendant's conviction and the filing of his brief in this court. In *Payne*, our Supreme Court overruled its prior cases[41] and concluded "that the blanket presumption in favor of joinder . . . is inappropriate and should no longer be employed. . . . In cases where the evidence cannot be used for cross admissible purposes . . . the blanket presumption in favor of joinder is inconsistent with the well established evidentiary principle restricting the admission of character evidence." (Citations omitted; internal quotation marks omitted.) Id., 548.

In reaching this conclusion, the court in *Payne* adopted the reasoning of Justice Katz' concurring opinion in *State* v. *Davis*, supra, 286 Conn. 38–45. In particular, *Payne* referred to Justice Katz' concerns regarding the lack of any benefit for judicial economy purposes when cases were not of similar character. *State* v. *Payne*, supra, 303 Conn. 549. "The argument for joinder is most persuasive when the offenses are based upon the same act or criminal transaction, since it seems unduly inefficient to require the state to resolve the same issues at numerous trials. . . . In contrast, when the cases are not of the same character, the argument

---

[41] See, e.g., *State* v. *Johnson*, 289 Conn. 437, 451, 958 A.2d 713 (2008); *State* v. *Sanseverino*, 287 Conn. 608, 628, 949 A.2d 1156 (2008), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 437, 953 A.2d 45 (2008), and superseded in part after reconsideration by *State* v. *Sanseverino*, 291 Conn. 574, 969 A.2d 710 (2009); *State* v. *McKenzie-Adams*, 281 Conn. 486, 521, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007).

for joinder is far less compelling because the state must prove each offense with separate evidence and witnesses [thus] eliminat[ing] any real savings in time or efficiency which might otherwise be provided by a single trial." (Citation omitted; internal quotation marks omitted.) Id., 580, quoting *State* v. *Davis*, supra, 43–44 (*Katz*, *J.*, concurring). Thus, our Supreme Court concluded: "[W]hen charges are set forth in separate informations, presumably because they are not of the same character, and the state has moved in the trial court to join the multiple informations for trial, the state bears the burden of proving that the defendant will not be substantially prejudiced by joinder pursuant to Practice Book § 41-19. The state may satisfy this burden by proving, by a preponderance of the evidence, either that the evidence in the cases is cross admissible or that the defendant will not be unfairly prejudiced pursuant to the *Boscarino* factors." (Footnote omitted.) *State* v. *Payne*, supra, 549–50.

Notwithstanding this shift in the law with respect to the proceedings in the trial court, our Supreme Court did not alter the analysis employed by appellate courts in reviewing claims of improper joinder. "Despite our reallocation of the burden when the trial court is faced with the question of joinder of cases for trial, the defendant's burden of proving error on appeal when we review the trial court's order of joinder remains the same. See *State* v. *Ellis*, 270 Conn. 337, 376, 852 A.2d 676 (2004) ([i]t is the defendant's burden *on appeal* to show that joinder was improper by proving substantial prejudice that could not be cured by the trial court's instructions to the jury . . .)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Payne*, supra, 303 Conn. 550 n.11; see also *State* v. *LaFleur*, 307 Conn. 115, 157–58, 51 A.3d 1048 (2012); *State* v. *Wilson*, supra, 142 Conn. App. 801; *State* v. *Bree*, 136 Conn. App. 1, 9, 43 A.3d 793, cert. denied, 305 Conn. 926, 47 A.3d 885 (2012). Furthermore, we continue to

review the court's decision to join the two criminal cases under the abuse of discretion standard. *State* v. *LaFleur*, supra, 158; *State* v. *Wilson*, supra, 800; see also *State* v. *Ellis*, supra, 375.

Our task, therefore, is to determine whether the defendant has established substantial prejudice[42] as a result of the court's decisions to join the bribery and extortion cases and to refuse to sever them. "A long line of cases establishes that the paramount concern is whether the defendant's right to a fair trial will be impaired. Therefore, in considering whether joinder is proper, this court has recognized that, where evidence of one incident would be admissible at the trial of the other incident, separate trials would provide the defendant no significant benefit. . . . Under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial. . . . Accordingly, we have found joinder to be proper where the evidence of other crimes or uncharged misconduct [was] cross admissible at separate trials. . . . Where evidence is cross admissible, therefore, our inquiry ends.

"Substantial prejudice does not necessarily result from [joinder] even [if the] evidence of one offense would not have been admissible at a separate trial involving the second offense. . . . Consolidation under such circumstances, however, may expose the defendant to potential prejudice for three reasons: First, when several charges have been made against the defendant, the jury may consider that a person charged with doing so many things is a bad [person] who must have done something, and may cumulate evidence against

---

[42] In *State* v. *David P.*, 70 Conn. App. 462, 467, 800 A.2d 541, cert. denied, 262 Conn. 907, 810 A.2d 275 (2002), we noted that "[w]hether a joint trial will be substantially prejudicial to the defendant's rights means something more than that it will be less advantageous to [him]." (Internal quotation marks omitted.)

him . . . . Second, the jury may have used the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial. . . . [Third] joinder of cases that are factually similar but legally unconnected . . . present[s] the . . . danger that a defendant will be subjected to the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all. . . .

"[Accordingly, the] court's discretion regarding joinder . . . is not unlimited; rather, that discretion must be exercised in a manner consistent with the defendant's right to a fair trial. Consequently, [in *State* v. *Boscarino*, supra, 204 Conn. 722–24] we have identified several factors that a trial court should consider in deciding whether a severance [or denial of joinder] may be necessary to avoid undue prejudice resulting from consolidation of multiple charges for trial. These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 155–56.

In its brief to this court, the state provided the following statement with respect to the matter of cross admissibility of the evidence: "Although never conceding the issue below, the state did not seek joinder based on cross admissibility, and does not argue it on appeal."[43]

_____

[43] This court succinctly has summarized the topic of cross admissibility of evidence in joint trials. "Our Supreme Court has determined that [w]here evidence of one incident *can* be admitted at the trial of the other, separate

Accordingly, our analysis is focused on the applicable *Boscarino* factors.[44] Applying those factors here, we consider whether the bribery and extortion charges involved discrete and easily distinguishable factual scenarios and the duration and complexity of the trial on both sets of charges. See *State* v. *LaFleur*, supra, 307 Conn. 155–56; *State* v. *Boscarino*, supra, 204 Conn. 722–24. We conclude that these factors support the defendant's claim that joining the two cases constituted an abuse of the trial court's discretion.[45]

1

We begin with the *Boscarino* factor pertaining to the length and complexity of the trial. The factor, at its core, is a question of whether the jury will confuse the evidence as a result of a long, complicated trial. See *State* v. *Boscarino*, supra, 204 Conn. 723–24. The jury heard eight days of testimony presented by the state over a two week period in the bribery case. It heard seven days of testimony over a thirteen day period for the state's evidence presented in the extortion case.[46] The defense presented a total of three days of evidence over a five day period. On the last day of the defense

trials would provide the defendant no significant benefit. It is clear that, under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial." (Emphasis in original; internal quotation marks omitted.) *State* v. *Webb*, 128 Conn. 846, 858, 19 A.3d 678, cert. denied, 303 Conn. 907, 32 A.3d 961 (2011); see also *State* v. *Morgan*, 140 Conn. App. 182, 201–202, 57 A.3d 857 (2013).

[44] The second *Boscarino* factor, which is whether the crimes were of a violent nature or concerned brutal or shocking conduct on the part of the defendant, is not applicable given the nature of the bribery and extortion charges against the defendant. See *State* v. *Davis*, supra, 286 Conn. 29; *State* v. *Boscarino*, supra, 204 Conn. 723.

[45] The concurrence correctly notes that at the time the trial court granted the state's motion to consolidate, the controlling law on joinder was *State* v. *Davis*, supra, 286 Conn. 17. We point out, however, that the majority in *Davis* applied the principles of *State* v. *Boscarino*, supra, 204 Conn. 714.

[46] On May 26, 2010, the jury heard evidence on both the bribery and extortion cases.

case, the state produced rebuttal evidence. In total, the jury heard evidence for seventeen trial days over a five week period.

Twenty witnesses testified for the state during the bribery case and sixteen during the extortion case.[47] Defense counsel called seven witnesses. The court admitted into evidence 114 state's exhibits and thirty-six defendant's exhibits. The state's exhibits included a copy of the voluminous documents of the bid made by USA Contractors to the city for the contract to improve the Park Street area, numerous correspondence regarding the issues with that project, including detailed reports regarding the extra charges by USA Contractors and the responses made by the city's Department of Public Works, thorough memoranda drafted by city employees outlining the various benefits and risks regarding the options to completing the project, the contradictory letters sent to U.S. Fidelity from McGrane and Crocini, a copy of the contract between the city and Urban Engineers, evaluations completed by Urban Engineers of the claims for extra charges made by USA Contractors, a copy of the bill provided to the defendant by USA Contractors for the work done on his house, photographs of the interior and exterior of the defendant's house, sample invoices for other customers made by USA Contractors, invoices from various subcontractors and supplies to USA Contractors for the items used in the renovation to the defendant's residence, e-mails and calendar entries from the defendant's computer, checks and e-mails from the treasurer's office, price quotes from The Home Depot, USA Contractors' file on the project at the defendant's residence, the defendant's cellular telephone records, the application filed by the defendant for a home equity

---

[47] Sullivan, the inspector with the Division of Criminal Justice in its public integrity unit, and Thomas Ladegard, an employee of the information technology department of the city, testified for the state in both cases.

loan, photographs of 1161 Main Street, the documents of the various real estate transactions and proposals, numerous e-mails to city officials regarding the 1161 Main Street proposal, Citino's cellular telephone records, and an insurance policy and other materials regarding parking lots in the city. The exhibits of the defendant were similar in nature to those of the state. In total, the jury heard testimony from forty-two witnesses and considered 150 exhibits during the five week trial.

In *State* v. *Boscarino*, supra, 204 Conn. 723–24, our Supreme Court concluded that where the trial lasted approximately ten weeks, the jury heard testimony from approximately fifty-five witnesses, some of whom testified in more than one case, and examined sixty-six exhibits, "it was highly likely that the jury might confuse the evidence in separate cases." The court also cautioned that "[w]hile jury confusion is a hazard of any long, complicated trial, *its impact is especially prejudicial in a joint trial of similar, but separate cases.*" (Emphasis added.) Id., 724.

A review of the relevant case law demonstrates that the trial in the present case was longer than those where our appellate courts have concluded that this factor did not favor the defendant. See, e.g., *State* v. *Payne*, supra, 303 Conn. 552 (trial lasted two weeks and consisted of eight days of testimony and twenty-one witnesses); *State* v. *Atkinson*, 235 Conn. 748, 766, 670 A.2d 276 (1996) (entire trial lasted five days and consisted of fifteen witnesses); *State* v. *Jennings*, 216 Conn. 647, 659–60, 583 A.2d 915 (1990) (jury heard testimony from fourteen witnesses over five days and considered twenty-eight exhibits); *State* v. *Herring*, supra, 210 Conn. 97 (jury heard eight days of testimony from twenty-three witnesses); *State* v. *Bree*, supra, 136 Conn. App. 10 (trial lasted approximately four days).

Additionally, we conclude that the two cases joined by the trial court presented a high degree of complexity.[48] The genesis of the bribery case occurred in February or March, 2005, when the defendant and his wife ordered, and then canceled, items for remodeling their kitchen from The Home Depot. They then spoke with Costa, who assumed their home improvement project shortly thereafter. The jury heard evidence of Costa's business practices and all of the details of the improvements made to the defendant's home. There was detailed testimony of the actual costs of the supplies and labor, contrasted with what eventually was charged to the defendant. The jury also heard evidence regarding Costa's work, and his numerous issues with the city's Department of Public Works, and later Urban Engineers, the third party hired by the city to review the extra claims submitted by Costa and USA Contractors, while working on the project for the city. It heard particularized information regarding the city's bidding procedures and review of the work done by Costa on the project. The state introduced evidence of the various city officials who considered the pros and cons of removing Costa from the project. The state also produced evidence of how the defendant assisted Costa in his dealings with the city, including obtaining early

[48] Cf. State v. Chance, 236 Conn. 31, 43, 671 A.2d 323 (1996) (issues presented in two cases were simple and straightforward); State v. Bree, supra, 136 Conn. App. 9 ("Although all three cases involved cigarettes taken from convenience stores, the three cases were not so similar so as to substantially prejudice the defendant. See State v. Fauci, 87 Conn. App. 150, 159, 865 A.2d 1191 [2005] [no abuse of discretion in joinder of three informations arising out of three robberies of three different fast food restaurants where, in each incident, rocks were thrown through glass doors of restaurants, but where each robbery took place on different date, at different location, with different victims], aff'd, 282 Conn. 23, 917 A.2d 978 [2007]; State v. Bell, 93 Conn. App. 650, 656, 891 A.2d 9 [not abuse of discretion to join two cases that both involved crimes at Friendly's restaurants where sole employee was put into walk-in refrigerator, but which took place on different days in different towns with different victims], cert. denied, 277 Conn. 933, 896 A.2d 101 [2006].").

payments. Furthermore, the jury heard how political opponents of the defendant learned of the work being done on his house. These events did not constitute an isolated moment in time, such as a murder or a robbery, but rather encompassed a two and one-half year time period.

Although the time of the events that make up the extortion case was shorter than the bribery case, the underlying facts were no less complicated. The jury heard testimony of another project within the city, the redevelopment of 1161 Main Street. It was presented with the origins of this undertaking, and the complex transactions involving various parcels of land, including one that was owned by the city. There was evidence of different parking lots, and the respective lot owners and operators. The jury also heard many details regarding the nature of city politics. For example, as the press uncovered the details of this redevelopment, the defendant requested the chief state's attorney to conduct an investigation. This led to the defendant's interview with Sullivan, during which the defendant was questioned about the underlying facts in both the bribery and the extortion cases. As with the bribery case, the facts in the extortion case developed over a period of time.

We agree with the defendant that both cases were complicated and that the underlying events took place over an extended period of time.[49] Further, we conclude

[49] The concurrence asserts that our appellate case law does not contain "an explanation or discussion of what constitutes a 'complex' case." While we do not necessarily disagree with this statement, we note that in *State v. Boscarino*, supra, 204 Conn. 714, our Supreme Court concluded, under the facts and circumstances of that case, that the complexity factor weighed in favor of the defendant. Id., 723–24. "The duration and complexity of the trial also enhanced the likelihood that the jury would weigh the evidence against the defendant cumulatively, rather than independently in each case." Id., 723. In that case, the defendant was charged with three separate violent sexual assaults stemming from incidents in South Windsor, Bloomfield and Windsor. Id., 715–16.

that the cases were similar, yet separate, thereby increasing the risk of prejudice. *State* v. *Boscarino*, supra, 204 Conn. 724. We are mindful of the careful approach taken by the state to present the case in seriatim. Despite the orderly manner in which the state presented the evidence, first of the bribery case and then of the extortion case, we conclude that the jury was not able to consider each charge separately and distinctly. See, e.g., *State* v. *Pollitt*, 205 Conn. 61, 68, 530 A.2d 155 (1987). Therefore, the defendant was prejudiced by the presence of this *Boscarino* factor.

2

We turn to the remaining applicable *Boscarino* factor, that is, whether the cases for which the defendant was tried jointly involved discrete, easily distinguishable factual scenarios. *State* v. *Boscarino*, supra, 204 Conn. 722–23. The defendant argues that evidence concerning the bribery charges did not involve a discrete event but rather involved conduct spanning a time period of approximately two and one-half years. He also contends that evidence regarding the extortion charges covered a time period of one and one-half years and included uncharged misconduct. We agree with the defendant that this factor supports his claim that the court abused its discretion in joining and not severing the bribery and extortion cases.

As we previously noted, these cases presented complex factual scenarios.[50] Both involved the defendant's

[50] The concurrence posits that the two informations in the case present two distinct scenarios, a bribery related to a kitchen renovation and an extortion stemming from a parking lot transaction. Distilled to its bare essence, this statement is true. Nevertheless, such a viewpoint does not account for the complex and complicated details surrounding each charged crime. Specifically, in regard to the Park Street project, the jury heard in painstaking detail about the work performed on the defendant's home, the manner in which the defendant's bill was fabricated, specifics as to the interworkings of municipal government and local politics, particulars about Hartford parking lots, and the features of the proposal to remodel 1161 Main Street. Our recitation of the facts in this case, as set forth in part I of

misuse of his power as mayor. Additionally, the cases contained evidence of similar, yet separate, ventures that were proposed as substantial improvements to the city and required testimony of how municipal government operates. The defendant's interview with Sullivan encompassed both cases, and the time periods during which each case occurred overlapped. These factual similarities between the two cases significantly impaired the defendant's right to a fair and independent consideration of the evidence in each case. Id., 723; *State* v. *David P.*, supra, 70 Conn. App. 469 ("[w]e are mindful that when incidents are factually similar, there is an inherent danger that a jury might use evidence of one crime to find a defendant guilty of the others"). We also note that the two cases were not legally related. Cf. *State* v. *Atkinson*, supra, 235 Conn. 765 (charge of escape in first degree related to felony murder charge because former indicated consciousness of guilt).

The state points us to *State* v. *Hilton*, 45 Conn. App. 207, 214–15, 694 A.2d 830, cert. denied, 243 Conn. 925, 701 A.2d 659 (1997), cert. denied, 522 U.S. 1134, 118 S. Ct. 1091, 140 L. Ed. 2d 147 (1998), where we concluded that a sixteen day trial with twenty-five witnesses and ninety-nine exhibits did not support the defendant's claim for improper joinder. We note that while the number of trial days in *Hilton* exceeded that of the present case, there were fewer witnesses and exhibits. Furthermore, the defendant in *Hilton* was charged with disparate crimes, namely, narcotics and murder. Id., 215. The state used eyewitness testimony of bystanders during the murder case and photographs of the murder site to convict the defendant on that charge. Id. In the narcotics cases, the state presented testimony from police officers and photographs of sites relating to the drug

this opinion, is illustrative of the complex nature of the proceedings before the jury. Put another way, the jury was presented with evidence of the actions of numerous parties, complicated in nature, over an extended time period.

charges, as well as the contents of two car trunks. Id. "We cannot conclude that the jury might easily have been confused by these photographs because the exhibits and evidence clearly fell into two easily identifiable and separate groups according to the charge and the distinctive factual scenario. We are also not persuaded that, under the circumstances of this case, a sixteen day trial was of such a duration as to itself enhance the likelihood of a cumulative weighing of the evidence." Id.

The underlying facts of the present case, namely, the intricate and overlapping fact patterns regarding the bribery and extortion cases, make *Hilton* inapposite. As noted, the facts of the bribery and extortion cases do not fall into easily identifiable scenarios. Thus, the underlying reasoning for our conclusion in *Hilton* cannot be used in the matter before us and, accordingly, we conclude that it is distinguishable.

We also note that the state's closing argument blurred the two cases, resulting in prejudice to the defendant. See, e.g., *State* v. *Ellis*, supra, 270 Conn. 379. At the outset of his closing remarks to the jury, the prosecutor stated: "Being the mayor of Hartford carries with it a lot of power. This is a case about how the [defendant] abused that power for his own benefit, both financially and politically." Later, the prosecutor again tied the two separate cases together when he remarked: "Now, that's the first half of the case. That's what the [defendant] did for his own personal benefit. Now, what happened with respect to the second half of the case, that's the half of the case where the [defendant] used his position—I should say, abused his position to gain political support . . . ." These statements, taken in context, painted the defendant as a politician who used his elected office as a conduit for both personal and political gain. As a result, the prosecutor's comments obscured the lines between the bribery and extortion cases. This made it more difficult for the jury to determine the defendant's

guilt in each case independently. See *State* v. *Ellis*, supra, 379–80.

For these reasons, we conclude that the defendant has met his burden of establishing that the court abused its discretion in joining the bribery and extortion cases.[51] We are mindful of the broad discretion afforded

---

[51] The concurrence, relying on Justice Katz' concurrence in *State* v. *Davis*, supra, 286 Conn. 39, expresses a concern that our conclusion, which is based on the entirety of the trial, that granting the state's motion for joinder constituted an abuse of discretion, fails to afford the appropriate deference to the judge who had to decide the motion well before the trial began and solely on the basis of the motions and arguments of the parties. We acknowledge the difficult position of the trial court in deciding the state's motion on November 4, 2009, some six months prior to the trial. Nevertheless, our analysis is consistent with that of *State* v. *Boscarino*, supra, 204 Conn. 714, and its progeny. See, e.g., *State* v. *Ellis*, supra, 270 Conn. 369, 378–80. In both of those cases, our Supreme Court reviewed the entirety of the proceedings and did not limit its evaluation solely to the information presented to the trial court at the time the state requested joinder. We therefore disagree with the concurrence on this issue.

Additionally, the cases cited in Justice Katz' concurring opinion in *State* v. *Davis*, supra, 286 Conn. 46–47, namely, *State* v. *Castelli*, 92 Conn. 58, 63, 101 A. 476 (1917), and *State* v. *Holup*, 167 Conn. 240, 245, 355 A.2d 119 (1974), do not support the concurrence because both predate our Supreme Court's opinion in *State* v. *Boscarino*, supra, 204 Conn. 714. Furthermore, the issue in *State* v. *Castelli*, supra, 62–65, and *State* v. *Holup*, supra, 241–48, was whether the court properly denied the defendant's motion for a trial separate from that of his codefendant and not whether the court improperly joined or failed to sever two informations against a single defendant. *Holup* also recognized that this rule is not absolute. "[E]xceptional cases may arise where a motion for separate trials has been denied, but during or after the joint trial it appears that the joint trial is resulting or has resulted in substantial injustice to one or more of the accused. In such circumstances, justice to the prejudiced accused requires that he be afforded a new trial." *State* v. *Holup*, supra, 245; see also *State* v. *Booth*, 250 Conn. 611, 623, 737 A.2d 404 (1999) ("[w]e have held that, even after concluding that there was no abuse of discretion in granting pretrial motions to join trials, an appellate court must also consider whether, as the trial developed, the joinder of the trials resulted in substantial injustice to the defendants"), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000); *State* v. *Diaz*, 69 Conn. App. 187, 199, 793 A.2d 1204 (2002) (same).

Moreover, we note that given our Supreme Court's decision in *State* v. *Payne*, supra, 303 Conn. 549–50, rejecting the blanket presumption in favor of joinder and shifting the burden to the state to prove, by a preponderance of the evidence, that the defendant will not be unfairly prejudiced by joinder pursuant to the *Boscarino* factors, we do not anticipate that future trial judges will be placed in such a problematic situation. In order to obtain a joinder where evidence is not cross admissible, the state will need to present

to the trial court in such matters. That discretion, however, is to be exercised in a manner consistent with a defendant's right to a fair trial. *State* v. *LaFleur*, supra, 307 Conn. 155–56; *State* v. *Davis*, supra, 286 Conn. 29. This right was compromised in the present case.[52]

## B

Having concluded that the cases were joined improperly, we turn to the question of whether this amounted to harmless error. *State* v. *Payne*, supra, 303 Conn. 552–53; see also *State* v. *LaFleur*, supra, 307 Conn. 163 n.35. The defendant bears the burden of establishing harm. *State* v. *Payne*, supra, 553. "The proper standard for review of a defendant's claim of harm is whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) Id. We conclude that the defendant met his burden of proving harm.

The following additional facts are necessary for our discussion. Prior to the start of evidence, during its preliminary instructions to the jury, the court informed the jury that it was required to consider each count in

the court with sufficient evidence to establish that a defendant will not be unfairly prejudiced by such a course of action.

Even if we were to assume, arguendo, that the court's decision to grant the state's motion to consolidate and join the bribery and extortion cases was proper, given what was known to the trial judge in November, 2009, we would conclude that the failure to grant the defendant's motion to sever made during the trial proceedings was an abuse of discretion when the trial court was more informed of the nature of the two cases.

[52] The concurrence expresses a concern that our opinion fails to provide concrete guidance for courts facing this issue in the future. First, we note that, as stated in the concurrence, "every case must be evaluated in light of its own facts and circumstances; no mechanical test can be applied." Second, our decision follows the controlling precedent from our Supreme Court, which is found in the analysis contained in part II A of this opinion. See, e.g., *State* v. *Boscarino*, supra, 204 Conn. 719–25.

the two informations separately when deciding each case. After moving for a mistrial, defense counsel requested that the court provide a "cautionary instruction that the evidence regarding the bribery case, which the state is now going to put on, is not admissible; it cannot be considered in connection with the extortion case. And when we get to the extortion case, I'm going to ask for a similar cautionary instruction . . . ." The prosecutor had no objection to the request for a cautionary instruction, and noted that there would be a clear delineation between the two cases. The court agreed to give the cautionary instruction requested by the defense.[53] The court provided a similar instruction on most days that the state presented testimony regarding the bribery case.

At the conclusion of the state's presentation of evidence regarding the bribery case, the court instructed the jury as follows: "The state has just completed presenting its evidence relating to the first set of charges against [the defendant]; that is, the charges of bribe receiving and fabricating physical evidence. At this point, the state will begin presenting its evidence relating to the second set of charges . . . . These cases were joined for the convenience of trial, but they are separate cases. . . .

"The defense will not be presenting any evidence relating to the bribery and fabricating physical evidence charges, if they do so, until after the state has presented its evidence in both cases. I instruct you to please keep an open mind and not reach a verdict until after all the

[53] Before the state's first witness testified, the court stated: "Now ladies and gentlemen of the jury, this witness and the witnesses that follow, until I tell you otherwise, are being presented by the state for the purposes of the first set of charges, the bribe receiving and the charges relating—the allegations of bribe receiving and the allegations regarding fabricating physical evidence. And the state has indicated there are going to be two portions, the second set of charges. Again, I'll caution you when that comes about."

evidence has been provided to you; you've heard the argument of both counsel, and I've instructed you as to the law.

"Furthermore, I remind you that these two cases must be considered separately, in other words, the evidence that has been presented by the state relating to the [bribery case] may not be considered by you in regard to the second case. Likewise, the evidence the state introduces relating to the [extortion case] cannot be considered by you in regard to the first case; they are two separate cases, each case must stand on its own proof, and the charges must be proven by the state beyond a reasonable doubt. With that, the state is going to begin at this point presenting evidence on the second set of charges."

On the first day that the state presented evidence exclusively as to the extortion case, the court instructed the jury that "the evidence that is being offered for this case, now, at this point, by the state, is being offered for the second set of charges, the charges involving the [extortion case]." The court gave similar cautionary instructions on one other day of this phase of the trial. Finally, during its charge to the jury, the court provided instructions regarding the consolidation of the two informations for trial.[54]

The court clearly made near herculean efforts to instruct the jury to keep the evidence separate for each case. We acknowledge that "[i]t is a fundamental principle that jurors are presumed to follow the instructions given by the judge." (Internal quotation marks omitted.) *State* v. *Ramos*, 261 Conn. 156, 167, 801 A.2d 788 (2002).

---

[54] Specifically, the court charged the jury: "You will note that there are two separate informations. Again, the state had commenced two separate cases against the defendant; they have been consolidated for the convenience of trial. The defendant is entitled to and must be given by you a separate and independent determination of whether he is guilty or not guilty as to each of the informations and each of the counts."

Our Supreme Court also has stated, however, that "a curative instruction is not inevitably sufficient to overcome the prejudicial impact of [inadmissible other crimes] evidence. . . . [W]e conclude that even the trial court's apt and thorough admonitions could not mitigate the potential for prejudice wrought by the joinder of the cases against the defendant." (Citation omitted; internal quotation marks omitted.) *State* v. *Boscarino,* supra, 204 Conn. 724–25; see also *State* v. *Jennings,* supra, 216 Conn. 660; cf. *State* v. *Atkinson,* supra, 235 Conn. 766–67 (in cases where prejudice not overwhelming curative instructions may tip balance in favor of determining whether right to fair trial was preserved).

Under the facts and circumstances of this case, we conclude that the court's instructions did not cure the improper joinder. Cf. *State* v. *Payne,* supra, 303 Conn. 553–54. In *Payne,* our Supreme Court concluded that the court's instructions to the jury "helped to cure the error" of improper joinder and, thus, that error was harmless. Id., 554. We employ the same analytical technique, but reach a contrary conclusion in this matter. Although the court's efforts to instruct the jury were laudable, they do not provide us with fair assurance that the verdicts were not affected substantially by the error. Similarly, we are not assured that the jury's verdicts were not substantially affected given the prejudice to the defendant from the joinder of these two cases. In a single trial, the jury was presented with a portrait of the defendant as a corrupt politician for two unrelated series of charges. It may well have accepted this characterization of the defendant and accumulated the evidence against him, used the evidence in one case to find him guilty in another, or used the sum of all of the evidence to find the defendant guilty of most of the individual counts contained in the two informations. The duration, nature, and complexity of the two cases

created a situation where the prejudice from joinder could not be remedied by the court's instructions.

The state also argues that because the jury inquired about a specific element of a single count in the bribery case, and then acquitted the defendant of that charge, this demonstrated that it followed the court's instruction and considered the evidence in each case separately. See, e.g., *State* v. *Davis*, supra, 286 Conn. 36–37. We are not persuaded. In *State* v. *Boscarino*, supra, 204 Conn. 724, our Supreme Court noted that an appellate court "can only speculate as to why the jury rendered varying conclusions as to the defendant's guilt . . . . It is beyond our power to probe the minds of the jurors in order to determine what considerations influenced their divergent verdicts." Thus, we disagree that the jury's single not guilty verdict supports the state's argument. As a result, we conclude that the defendant is entitled to new, separate trials on the bribery and extortion charges.

C

We next address the defendant's claim that he suffered substantial prejudice as a result of the trial court's failure to sever the two cases because it improperly compromised his decision to testify in the bribery case and not to testify in the extortion case. We agree with the defendant.

The following additional facts are necessary for our discussion. In his November 2, 2009 objection to the state's motion to consolidate, the defendant briefly mentioned that consolidation would implicate "a host" of his constitutional rights, including "the ability to exercise his right to testify." Aside from this passing reference, the defendant did not discuss this argument further, and his memorandum of law contained no substantive analysis of the matter. On May 18, 2010, in the midst of the state's presentation of evidence on the

bribery charges, defense counsel notified the court and the prosecutor that he would be moving to sever the cases on the ground that the defendant wanted to testify in the bribery case but not in the larceny case. Defense counsel stated that this decision was based on his assessment of Costa as a witness for the prosecution. Two days later, defense counsel filed a motion pursuant to Practice Book § 41-18.[55] He incorporated the previous arguments pertaining to the *Boscarino* factors. Additionally, he expressly claimed that the defendant substantially was prejudiced by the consolidation because he wanted to testify in the bribery case and continue to exercise his fifth amendment[56] right not to testify in the extortion case. In his motion, the defendant provided the following testimony that he would give in the bribery case: "The [d]efendant's reasons for misleading . . . Sullivan during their initial interview on June 27, 2007; [h]ow . . . Costa became involved in the [d]efendant's home renovation project, details regarding when he first approached . . . Costa and requested a bill, the number of times that he personally followed up with Costa regarding his request, and the reasons for his delay in payment . . . [t]he context of his involvement in the letter of May 16, 2006, directed to U.S. Fidelity regarding the Park Street Project; and . . . [t]he context of his involvement in the issuing of emergency and manual checks from the [t]reasurer for the [c]ity . . . to USA Contractors." The motion further stated that the defendant's testimony "on these points, at a minimum, will be absolutely critical for the jury's complete assessment of both his intent, as well as interactions that he alone may have had with . . . Costa. Thus, his ability to exercise his right to testify is critical because he is the sole source of information on these points." Defense counsel also explained why the defen-

---

[55] See footnote 8 of this opinion.

[56] The fifth amendment to the United States constitution provides in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

dant did not want to testify in the extortion case. These reasons included: (1) the defendant's versions of the underlying facts in the larceny case would be presented to the jury when it heard his interview with Sullivan; (2) the risk of prejudicial cross-examination regarding uncharged misconduct; and (3) his lack of involvement as to why Giles demanded a payment of $100,000.

On May 20, 2010, the court heard argument on the defendant's motion. At this hearing, defense counsel further explained why the defendant did not want to testify with respect to the extortion charges. At the outset, defense counsel noted: "And we're at this point, now, where we have a pretty good sense of what the state's bribery case looks like in terms of the evidence and the credibility of the witnesses. And it's our view that the defendant has to testify in order to explain certain things in connection with the bribery charge. One of which is, the evidence was introduced today regarding the interview by . . . Sullivan on [June 27] at City Hall, and there are other matters that are set out in our papers." Counsel also identified the negatives to having the defendant testify with respect to the extortion charges.[57] Counsel pointed out that this argument

---

[57] At this hearing, defense counsel argued as follows: "The problem with [the extortion charges]—we have a tape-recorded conversation from . . . Sullivan, which is now an exhibit, and in that tape-recorded conversation we feel that the bulk of the defendant's position is laid out in the interview. And the problem with testifying in the larceny case is, we're going to be subject to attack from several different corners, and one of the areas is all of this so-called prior bad acts evidence or other crimes evidence or whatever it is—misconduct evidence involving . . . Giles, and Giles—there's about a—three different episodes involving . . . Giles; picking up his garbage, his eviction contract and another matter. And so the defendant testifying on those sets of charges is going to be at a great, great disadvantage because he's going to be hit with so many subjects, and it would be difficult to handle that.

"And so if we end up in a situation where these matters are consolidated to verdict, we are going to be having to make some very difficult choices. And one of the choices before us will be whether or not to forgo from testifying at all because we're going to get into charge number two, the larceny charge, and, therefore, not being about to testify in the bribery charge because we can't testify halfway."

had not been presented to the court in a such a specific nature because he needed to evaluate the evidence during the course of the proceedings. After argument from the prosecutor, defense counsel again noted that this claim could be raised only after the state's witnesses testified in court, namely, Costa. He then concluded his argument by stating: "And we've had an opportunity to do that, and consequently, we know we have to testify if we have a chance to persuade the jury to acquit in connection with the bribery case. We feel we do not— from what we know, we do not have to testify or wish to testify in the other case because—for the reason I've already stated." The court then denied the defendant's motion.

The matter was raised again on June 9, 2010, following the state's presentation of evidence regarding the extortion case, when the defendant renewed his arguments in a motion to sever. The court held a hearing on June 11, 2010, where defense counsel provided greater detail of what the defendant's testimony would be.[58]

[58] Specifically, defense counsel stated: "And so what I had prepared to do, with the court's permission, is to lay on the record why it is important for the [defendant] to testify on the bribery [case], and I will list them seriatim; one, he needs to explain the lies that were made to . . . Sullivan with . . . Rose in the room, and he'll testify that he was embarrassed to reveal that he had not paid the bill to . . . Costa with . . . Rose present in the room.

"The efforts—he'll testify as to the efforts he had made to do the home improvement project himself, and the fact that he was at The Home Depot picking out a product—a countertop product; the fact that he had been to other stores doing that before he got to Home Depot. The fact that . . . Costa came down to Home Depot to see him and advised him that he could do it a lot cheaper; and thereafter, the defendant will testify he, at . . . Costa's invitation, he went to his showroom.

"He'll testify as to his historical relationship with . . . Costa as a friend and political supporter that went back many years; and that when . . . Costa was doing the work in his home, he did not view it as a contractor for the city . . . doing the work, but as a friend and will admit, if he testifies, that in retrospect that was a mistake.

"He will testify that he repeatedly requested a bill from . . . Costa. . . . Costa testified that there was a bill request, but I think his testimony was only on one occasion; but [the defendant] will testify when . . . [his wife] came back home from the hospital and they had a reception for her, he asked him for a bill, and he asked him for a bill a number of times thereafter.

"He will testify, Your Honor, concerning the effect of his wife's illness regarding—regarding his conduct, and how it affected him in terms of concentrating, reading material that might have been available to him; focusing on the bill that was due . . . Costa . . . [and Costa would] say, in light of Maria's illness, there was no hurry on the bill, and [the defendant] was focused on Maria's illness and put the payment of the bill on the back burner and really did not think there was any immediacy to pay it, although he had every intention to pay it.

"Furthermore, his problem [in] terms of focus and the problems with the bill, was tremendously compounded by BlueCross and BlueShield's refusal to pay the medical bills for the doctor in New York at Columbia Presbyterian Hospital, and he would receive bill after bill from Medicare, BlueCross/BlueShield showing large balances that were due; and this—and this caused him to realize that he might have to get a major loan, not $20,000 loan, but a major loan, not only to pay for the medical bills, but also to pay . . . Costa. And the medical bills just—were not resolved for a long period of time after [Maria's] surgery.

"He will further testify of his lack of involvement in the home improvement project, and that, principally . . . Costa interacted with Maria Perez and that he had little, if anything, to do with it because most of the time he was off and running . . . City Hall, getting home late in the day from his school board duties, and his many, many obligations as the mayor of the city . . . . And he seldom saw . . . Costa at the house or his workmen at the house.

"He'll further testify that he—when he asked . . . Costa for the bill . . . Costa told him that it was going to run between twenty-six and twenty-eight thousand dollars, and he was stunned by that amount. And he'll testify concerning that, in support of his claim, that he had every intention to pay the bill, otherwise he would not have been stunned by the amount that . . . Costa quoted him.

"He'll testify that when he finally got the bill from . . . Costa, he did not read the bill; he did not analyze the bill. He simply saw that the amount was twenty-thousand plus, and he was relieved that it wasn't twenty-six or twenty-eight thousand. And there was no knowledge, on his part, that the bill was incomplete and misleading or whatever. He just saw that number, $20,000, and he was pleased that it was—it was in that ballpark.

"He'll testify that the decision to turn over the bill—the invoice, through counsel, to the office of the chief state's attorney was in no way intended to mislead the state, it simply was in an attempt to show the state what they asked for, which was the bill he received from . . . Costa.

"He'll further testify, Your Honor, that his involvement with Costa regarding the Park Street—regarding the Park Street project, he'll further testify concerning his decision to get . . . Crocini involved in the project. He'll testify as to the project's delay, and that it was an important project to him for many reasons. Once it was—it was a project to benefit the Latino community, of which he was obviously a part and a leader; and also a source of pride to be able to develop something that had not been developed over the years by any predecessor mayors.

"He'll testify concerning his decision to accept and follow . . . Crocini's decision or recommendation to send the May 16, 2006 letter to United States Fidelity/Saint Paul's Insurance Company, and he will deny that accusation made by . . . Patel that there was an episode in his office where he was shaking a letter and saying what the F is this; that never occurred, he will testify in his own defense.

"He will further testify that his decision not to assist . . . Costa in his quest for the payment of claims and extras, and many of which were detailed

## Defense counsel then explained why the defendant would not testify with respect to the extortion case.[59]

in the lawsuit and other documents, that he did not, in any way, participate to help . . . Costa get those paid.

"He'll testify about his concern of a delay on the Park Street project—if the project were delayed by terminating . . . Costa, and the tremendous problems it would cause him, not only in his service to the Latino community, but also politically by the reaction among the merchants and other people who were interested in the project.

"He will further testify that there were many more projects and issues that required his time and attention during the 2005-2007 period of time when Park Street was going on, including the school building projects, the library construction controversy, and the issues of violent crime in the city . . . and that when compared—with these problems compared to [the] Park Street streetscape project, the Park Street project was a minor project in terms of his priorities at the city . . . and the enormity of the other projects that he was involved in, including the eleven school projects, which were budgeted at between four hundred and five hundred million dollars.

"He will further testify that the—that [the] practice of supporting business-men like—minority businessmen or contractors, like USA Contractors, was one of his top priorities as a mayor and as a candidate for mayor and in following through with that commitment, he would make efforts to make sure that they got their approved invoices paid in a timely manner out of the treasurer's office.

"He will testify as to the reasons he took to help [to] get some of . . . Costa's approved invoices paid. He will testify that he devoted his life to public service, and further testify that he is not interested in worldly possessions or the accumulation of wealth or other material things.

"He will also testify that his religious convictions guide his conduct, and those convictions would not, in any way, permit him to accept a bribe or to do anything that not only—or to fabricate evidence, or anything else that would violate his moral code."

[59] "This—he would not offer testimony because of a number of reasons. One of which is the credibility of . . . Citino. The defendant is of the view that . . . Citino is not a believable witness, is a convicted felon, is a bully, and, in fact, is a person who threatened the [defendant] when he didn't get his way with regard to the Davis Building development. So, he will rely to a large extent on the credibility—a lack of credibility of . . . Citino.

"He will further rely upon the audiotape, that is in evidence, that details essentially substantial form, although there are a couple of issues there, too, but substantially lays out his defense with regard to why he wanted . . . Giles to remain until the construction project began; that is in evidence, there's no need to deal with that.

"The other issue of importance is that charge is . . . Giles' rights vis-à-vis 1143 Main Street. The testimony in there is very strong, that a lot of pretty intelligent people thought that . . . Giles had rights to that property, either in the form of a lease, or in the form of a contract, or in the form of a management agreement. The evidence is clear, for example, that [Jon] Concilio [of Chozick Realty in Hartford] prepared a document that talked about the lease. Mr. Palmieri, early on—this is evidence—these are in evi-

The court, after hearing argument from the parties noted that the defendant had made a showing as to why he wanted to testify in the bribery case and not to testify in the extortion case. Nevertheless, it denied the defendant's motion to sever the two cases.[60]

dence, produced a document that indicated that . . . Giles had certain rights. [John] Kardaras, the lawyer representing . . . Giles, thought he had certain rights, and that the fact that he had a sublease to LAZ, LAZ thought he had certain—he had a lease, and Giles represented in the sublease with LAZ that he had a lease. And remarkable, that five year lease—when the approach was made to Giles by Citino, through Mr. Concilio, to try to work out something, the balance that was due on that lease if it had gone to term, was $106,000. The full value of it was one-thirty-five, but at the time, it was $106,000.

"The testimony is in with—regarding to the Redevelopment Agency minutes, and the fact that, obviously, at some point in time . . . Giles had rights to that property; he had his rent reduced at that property; he then had his rent reduced again.

"So, the essence of the defense is that everyone reasonably believed that . . . Giles had rights, and that those rights had to be considered as part of the transaction, and that the request that he be allowed to park there until the building came down and the project began, it's based upon the testimony of other people and other exhibits, and there's no need for the defendant to get on the [witness] stand and talk about that.

"The downside, Your Honor, of [the defendant] getting on the stand to testify on this charge of larceny by extortion . . . I rely upon the arrest warrant affidavit, in those areas where the state spends a lot of time detailing all of these favors that [the defendant] did for . . . Giles. First, 1214 Main Street, that is going to be revisited on cross-examination if he takes the stand. The reduction of his rent as—over at 1143 Main Street will be attacked; the increase in his eviction fees that were given to Giles, that will be attacked; the removal of large amounts of garbage from Giles' business location, that will be attacked. The fact that Giles was trying to sell, in his warehouse— or make an arrangement of his warehouse for storage, this will be attacked.

"Now, that's bad enough, because now we're getting into conduct that the jury has not heard about except 1214 Main Street, and that is going to paint the picture—a negative picture of the [defendant] that would not be the case if we were just dealing with [the] bribery count.

"And in addition, Your Honor, we would have this problem if he took the stand. We have the e-mails, the most powerful evidence that the state has are these e-mails that Citino sent to the [defendant's] office; March 15—I think March 5, March 16, April 23—and those emails would permit a cross-examination to go on for a long period of time; did you read this, did you read this, did you see this, I mean, we could imagine how devastating that type of cross is going to be. And that is something that we feel is one of the—one of the principal reasons that we elect not to testify on that count."

[60] The state argues that pursuant to *State* v. *Harrell*, 199 Conn. 255, 265, 506 A.2d 1041 (1986), the defendant was required to testify in order to obtain appellate review of his claim. We conclude that *Harrell* is distinguishable,

We begin our analysis with a brief review of the relevant case law. In *State* v. *Schroff*, supra, 198 Conn. 408, the defendant filed a motion to sever on the ground that he wanted to testify as to the sexual assault and kidnapping charges that had been lodged against him, but not to testify as to the firearms charges that had been lodged against him. At the outset of its analysis, the court noted that the matter of severance was within the sound discretion of the trial court and that the defendant bore a heavy burden of showing substantial injustice. Id., 408–409. Our Supreme Court then detailed the test for determining whether the denial of the motion to sever was proper; that is, balancing expedition and economy of judicial resources against the defendant's interest in having a free choice regarding testifying. Id., 409. Before that question could be answered, however, the defendant was required to provide the trial court with his reasons for testifying in one case and not the other. "[N]o need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other. In making such a showing, it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of economy and expedition in judicial administration against the defendant's interest in having

---

and thus not applicable to the present case. In *Harrell,* our Supreme Court stated that it would follow the rule of *Luce* v. *United States,* 469 U.S. 38, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984), on a prospective basis. *State* v. *Harrell,* supra, 265. "The *Luce* court . . . held that to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." (Internal quotation marks omitted.) Id., 265–66. The defendant in the present case did not present a claim of improper impeachment with a prior conviction; therefore, this case does not come within the scope of *Harrell.*

a free choice with respect to testifying." (Internal quotation marks omitted.) Id.; see also *State* v. *King*, 187 Conn. 292, 306–307, 445 A.2d 901 (1982), overruled in part on other grounds by *State* v. *Payne*, 303 Conn. 538, 547, 34 A.3d 370 (2012). The court concluded that the defendant had failed to substantiate his claim of substantial prejudice, and therefore his claim failed on appeal. *State* v. *Schroff*, supra, 410.

We now turn to the seminal case on this issue, *State* v. *Chance*, 236 Conn. 31, 671 A.2d 323 (1996). In *Chance*, the defendant raised a pretrial objéction to the state's motion to consolidate, arguing that he might elect to testify in one case and not the other. Id., 45. Our Supreme Court concluded that the defendant had failed to establish that the trial court abused its discretion in consolidating the cases pursuant to *State* v. *Schroff*, supra, 198 Conn. 405. "The trial court properly overruled the defendant's pretrial objection to the consolidation of the arson charge and the assault charge because the defendant failed to divulge a clear intent to testify as to one count but not the other." *State* v. *Chance*, supra, 46. The court acknowledged that "there are cases in which a defendant will have legitimate reasons for being unable to make a decision as to whether to testify until shortly before trial begins, and that a court should not prod defendants to make that decision prematurely. . . . After the trial commenced, the defendant never again reasserted his claim that his decision concerning whether to testify was being or had been in any way infringed upon by the consolidation of the charges against him. *Once the defendant's intentions as to testifying became clear, he could and should have made them clear to the trial court and renewed his objection to consolidation on the grounds that he had been deprived of a meaningful choice as to whether to testify.*" (Emphasis added.) Id., 47–48.

We now apply *Chance* and *Schroff* to the facts of the present case. In his pretrial opposition to the state's motion to consolidate, the defendant argued that consolidation implicated a "host of [his] constitutional rights . . . including . . . the ability to exercise his right to testify." Standing alone, the mere mention of this right does not meet the requirements of *State* v. *Chance*, supra, 236 Conn. 46; see also *Closs* v. *Leapley*, 18 F.3d 574, 578–79 (8th Cir. 1994) (defendant failed to offer specifics as to why he was not willing to testify as to all counts). Put another way, the defendant's pretrial objection to the state's motion to consolidate, by itself, fails to substantiate his claim of prejudice. See *State* v. *Schroff*, supra, 198 Conn. 410.

Our Supreme Court recognized in *Chance* that when a defendant's intentions regarding testifying become clear during the trial, he or she must make them clear to the court by renewing his objection to consolidation. *State* v. *Chance*, supra, 236 Conn. 47–48. The defendant followed this course when he filed his motion to sever on May 20, 2010, following the conclusion of the state's evidence as to the bribery charges. Specifically, the defendant stated: "In addition to those grounds previously articulated in his original objection to joinder, it is now clear that the [d]efendant will be even more substantially prejudiced because he wishes to testify regarding the [s]tate's bribery charges, but will continue to exercise his fifth amendment right not to testify regarding the larceny charges. Even if the [c]ourt's original decision on joinder was arguably correct, this additional ground (which is based on an analysis of the evidence that has been submitted thus far at trial) is substantial and warrants severance." On May 20, 2010, in both the motion and at the subsequent hearing, the defendant explained the important need to testify in the bribery case, i.e., his reason for lying to Sullivan and the defendant's responses to Costa's testimony,

and the strong need to refrain from testifying in the extortion case, i.e., avoiding cross-examination on areas of uncharged misconduct. Additionally, at the conclusion of the state's cases, the defendant provided a more specific explanation of his bases for wanting to testify only as to the bribery case. See footnotes 57 and 58 of this opinion.

The state presented evidence in the bribery case that revealed that the defendant had lied to Sullivan. Specifically, during the interview with Sullivan, the defendant falsely stated that he had paid Costa approximately $20,000 for the work done on his house. The jury also heard testimony of the defendant's conduct following the interview, including backdating his application for a home equity loan. The need to rehabilitate these untruths is evident, and to do that, the defendant's testimony was required. In contrast, the defendant's defense with respect to the extortion case consisted of his strategy that a jury would find him more credible than Citino, a convicted felon. This course of action sustained significant damage when the jury heard the defendant's falsehoods regarding the bribery case. Had the trials been severed, a jury hearing the extortion charges would not have known of the defendant's lies to Sullivan and a jury hearing the bribery case would have had to determine whether to accept the defendant's explanation regarding his interview with Sullivan, and whether to believe his version of interactions with Costa, both as to his home and the city project. See, e.g., *Cross* v. *United States*, 335 F.2d 990–91 (D.C. Cir. 1964). Under these facts and circumstances, we conclude that the defendant's interest in testifying in one case outweighed the considerations of judicial economy. We conclude, therefore, that the court abused its discretion in failing to sever the bribery case from the extortion case.

We turn briefly to the issue of harm. This claim, unlike the defendant's *Boscarino* argument, is of constitutional magnitude. In *State* v. *King*, supra, 187 Conn.

303–304, our Supreme Court observed: "As to any influence on the defendant's decision to testify which the joinder might have had, we note that this claim was never raised at trial or at the hearing on the pretrial motion for joinder. Since this claim does implicate a fundamental constitutional right, i.e., the right of an accused to testify; see Connecticut Const., art. I. § 8; we will review this claim." (Footnote omitted; internal quotation marks omitted.) Therefore, the state bears the burden of proving that the impropriety was harmless beyond a reasonable doubt. See *State* v. *Melendez*, 291 Conn. 693, 711, 970 A.2d 64 (2009). The state has not briefed the issue of harmlessness and thus has failed to carry its burden. Consequently, we conclude that the defendant's conviction must be reversed and that he is entitled to new trials on the bribery and extortion charges.

The judgments are reversed and the cases are remanded for new, separate trials on the bribery and extortion charges.

In this opinion BISHOP, J., concurred.

LAVINE, J., concurring. I agree with the majority that the state presented sufficient evidence to convict the defendant, Eddie A. Perez. I also agree that the defendant's judgments of conviction should be reversed and that the cases should be remanded for separate trials on the bribery and extortion charges, but for different reasons. I conclude that the trial court did not abuse its discretion on November 4, 2009, by granting the state's motion to join the bribery and extortion charges for trial, but that the court improperly denied the defendant's motion to sever the cases on May 20, 2010, when the defendant provided the court with a detailed explanation of the reasons he wanted to testify in the bribery

case, but not the extortion case.[1] See footnotes 57 and 58 of the majority opinion. Moreover, I would resolve the defendant's claims on constitutional grounds, rather than on an analysis of the *Boscarino* factors.[2] I therefore concur in the majority opinion.

I

I disagree that the court abused its discretion when it granted the state's motion to consolidate the bribery and extortion charges against the defendant in a single trial. I briefly review the procedural issues relevant to this claim. In its motion to consolidate, the state asserted that joinder was appropriate because (1) it would foster judicial economy and administration, (2) the charges set out discrete, easily distinguishable factual scenarios, (3) the crimes alleged were not of a brutal or violent nature, (4) the presentation of the evidence in an orderly sequence would contribute to the distinguishability of the facts alleged in each information, and (5) the court's instructions would enable the jury to consider the cases separately. The state indicated that it submitted the motion for consolidation pursuant to Practice Book § 41-19 and *State* v. *Davis*, 286 Conn. 17, 26–38, 942 A.2d 373 (2008).

---

[1] In this case, I believe that there are two decisions of the trial court that are relevant to the defendant's claims on appeal: Did the court abuse its discretion by (1) granting the state's motion to consolidate and (2) denying the defendant's May 20, 2010 motion to sever. I believe that the majority's conclusion that "the court improperly joined the defendant's two criminal cases for a single trial" is a global *Boscarino* analysis rather than an independent analysis of the two motions facing the court. Moreover, the majority's analysis considers the entirety of the trial and does not restrict its review of the facts before the court. The trial court is not prescient and able to look beyond the allegations of informations that allege factually and legally distinct cases. See *State* v. *Boscarino*, 204 Conn. 714, 715, 529 A.2d 1260 (1987). The burden is on counsel to provide the court with a factual and legal basis to support the client's position that joinder is warranted or is unduly prejudicial to the defense. See *State* v. *Davis*, 286 Conn. 17, 47, 942 A.2d 373 (2008) (*Katz, J.,* concurring).

[2] See *State* v. *Boscarino*, 204 Conn. 714, 723, 529 A.2d 1260 (1987).

In his objection to the motion to consolidate, the defendant identified the key prejudicial factor as follows: "[I]f there were separate trials the evidence from either case would be completely inadmissible," but without addressing the character of the evidence or its effect on his defense. He also asserted that consolidation implicated a host of his "constitutional rights under the fifth, sixth and fourteenth amendments to the federal constitution and article [first, §§ 9 and 20] of the state constitution, including his rights to due process, a fair trial, confrontation, equal protection, the effective assistance of counsel, and the ability to exercise his right to testify." Although the defendant cited the law generally in his memorandum of law with regard to the cross admissibility issue,[3] he did little more than list the constitutional rights he claimed to be at issue. On November 4, 2009, at the hearing on the motion to consolidate, counsel for the defendant addressed concerns over the length of jury selection, consolidation of the charges pending against Abraham Giles with the extortion case, discovery and trial preparation concerns, and defense counsel's trial schedule. Counsel did not address the issues raised in the defendant's memorandum of law in objection to the motion to consolidate.

In granting the state's motion to consolidate, the court stated, in part: "I view the crimes as distinct. I am going to rely on the *Davis* claim with all due respect, counsel. I have to do what the Chief Justice says is the law, and I never disagree with the [United States Court of Appeals for the] Second Circuit; they are distinct crimes. I don't view a problem with cross contamination; they're not crimes of a brutal or shocking nature. Other jurisdictions have . . . consolidated white collar

---

[3] The defendant's objection was filed more than two years prior to our Supreme Court's decision in *State* v. *Payne*, 303 Conn. 538, 34 A.2d 370 (2012).

crimes. In fact, I wrote a consolidation of white collar crimes in cases in this [judicial] district, so the consolidation is going to happen. I'm granting the motion to consolidate."

This procedural history places the issues on appeal in context. The court granted the motion to consolidate on November 4, 2009. *State* v. *Davis*, supra, 286 Conn. 17, was the then state of the law on joinder. Our Supreme Court's decision in *State* v. *Payne*, 303 Conn. 538, 34 A.3d 370 (2012), was released on January 24, 2012, subsequent even to the defendant's having filed his main brief in this court on January 9, 2012.

First, I consider the discretion that pertains to consolidation or joinder of cases for trial. In her concurring opinion in *Davis*,[4] Justice Katz took the "opportunity to clarify the standard that the reviewing court must apply in considering a challenge to a trial court's decision granting joinder or denying severance. Our case law has tended to conflate what should be a two part inquiry. Consistent with the reviewing court's role in examining any other claim of nonconstitutional error, it is clear that there are two questions that must be addressed in the affirmative before a defendant is entitled to a new trial: First, did the trial court abuse its discretion in granting joinder or denying severance? Second, did that decision result in harmful error?" *State* v. *Davis*, supra, 286 Conn. 39.[5]

---

[4] The language and cases cited by Justice Katz concern cases in which two defendants are tried within one trial. The issue, however, relates to the cross admissibility of evidence.

[5] I note that *Davis* was decided more than twenty years after *Boscarino* and therefore informs our understanding of joinder and severance. I also recognize that Justice Katz relies on cases that predate *Boscarino* by decades, but those cases stand for the proposition that counsel must specifically identify the factual basis that supports their position. The issue addressed by Justice Katz in *Davis*, in part, was the obligation of counsel to inform the court of "the character of the evidence and its effect upon the defense" that must be proffered to the court. (Emphasis omitted; internal quotation marks omitted.) *State* v. *Davis*, supra, 286 Conn. 46. The issue in

Justice Katz also stated that "[i]n this court's early case law on joinder, the court recognized that the reviewing court's determination as to whether the trial court abused its discretion *necessarily must be based on the evidence before the court when ruling on the motion*: Where from the nature of the case it appears that a joint trial will probably be prejudicial to the rights of one or more of the parties, a separate trial should be granted when properly requested. *The discretion of the court is necessarily exercised before the trial begins, and with reference to the situation as it then appears* . . . . The controlling question is whether it appears that a joint trial will probably result in substantial injustice. It is not necessarily a ground for granting a separate trial that evidence will be admissible against one of the accused which is not admissible against another. . . . *When the existence of such evidence is relied on as a ground for a motion for separate trials, the character of the evidence and its effect upon the defense intended to be made should be stated, so that the court may be in a position to determine the probability of substantial injustice being done to the moving party from a joint trial. It does not appear from the record that the trial court was so advised in this case, and on that ground alone it is impossible to say that the court abused its discretion in denying [the defendant's] motion.* . . . *State* v. *Castelli*, 92 Conn. 58, 63, 101 A. 476 (1917); accord *State* v. *Holup*, 167 Conn. 240, 245, 355 A.2d 119 (1974) (Because a preliminary motion for separate trials obviously must be decided before the actual trial, the merits of the motion can be determined only on the basis of whether at that time it appears that injustice is likely to result unless separate trials are held. It is for this reason that in support of such a motion the court must be fully informed of any

the *Davis* concurrence, the cases cited therein, and the present case concerns evidence that may come before the jury if the cases are consolidated.

and all circumstances which indicate that injustice to the parties requires separate trials.).

"Indeed, were the reviewing court not to limit its initial abuse of discretion determination to the evidence then before the trial court, there would be a grave damage of mistrials from causes which were unknown to the trial court at the time when it was required to decide the question. *State* v. *Castelli*, supra, 92 Conn. 65. The trial court's rulings on such motions usually are predicated on the face of the charging document and whatever information is provided to the court regarding evidence to be adduced at trial. Therefore, the reviewing court necessarily must base its determination as to whether the trial court abused its discretion by looking to the state of the record at the time the trial court acted, not to the fully developed record after trial." (Emphasis altered; internal quotation marks omitted.) *State* v. *Davis*, supra, 286 Conn. 46–47.[6]

Given the discretionary standard articulated by Justice Katz in *Davis*, I cannot agree that the trial court abused its discretion by *initially* consolidating the bribery case and the extortion case. Although the defendant listed a number of state and federal rights that he claimed would be prejudiced by a consolidated trial, he did little more than that in his objection to consolidation. During the hearing on the state's motion to consolidate, defense counsel did not mention the right to testify, or refrain from testifying, at trial. Without the benefit of specific facts and the full circumstances to

---

[6] "For the same reason, the reviewing court cannot consider the remedial effect of a curative instruction by the trial court when determining whether it had abused its discretion at the time it made a ruling on the motion before it. To the contrary, it is only after the reviewing court determines that the trial court had abused its discretion that such subsequent actions become relevant to a determination of whether, despite the abuse of discretion, the defendant obtained a fair trial." *State* v. *Davis*, supra, 286 Conn. 47 n.7 (*Katz, J.*, concurring).

evaluate the injustice to which the defendant alluded, the court lacked a basis upon which to respond to the defendant's claimed desire to testify in one case and not the other. See *State* v. *Chance*, 236 Conn. 31, 46, 671 A.2d 323 (1996) (defendant failed to divulge clear intent to testify as to one count but no other count).[7] Indeed, the defendant himself may not have decided that he might want to testify in one case and not the other until the trial was in progress. It was not until May 18, 2010, that the defendant raised the specter of testifying in one case but not the other. And when he did, it was to put the court on notice that he was reserving the right to move to sever at the conclusion of the bribery case. See footnote 40 of the majority opinion. Consequently, I agree with the majority's analysis of the court's denial of the defendant's May 20, 2010 motion to sever.

As to the defendant's claim that the court improperly granted the motion to consolidate because the evidence was not cross admissible, the memorandum of law in opposition tracked the general rules of law pertaining to joinder. It did not specify the evidence the state was going to present. See *State* v. *Chance*, supra, 236 Conn. 46. The focus of the defendant's attack on the motion to consolidate at the November 4, 2009 hearing was the lack of judicial economy and defense counsel's trial schedule. Because the defendant's objection to the

---

[7] "[N]o need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other. In making such a showing, it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of economy and expedition in judicial administration against the defendant's interest in having a free choice with respect to testifying." (Internal quotation marks omitted.) *State* v. *Schroff*, 198 Conn. 405, 409, 503 A.2d 167 (1986).

state's motion to consolidate was of a general nature, there was an insufficient proffer of evidence to move the question beyond the realm of speculation. I conclude that the court did not abuse its discretion by granting the state's motion to consolidate, but that it improperly denied the motion to sever when the defendant informed the court that he wanted to testify as to one case but not the other.

## II

I disagree with the majority's conclusion that the bribery and extortion cases were so complex that the jury was not able to consider each charge separately and distinctly and that, consequently, it was an abuse of discretion for the trial court to permit the cases to be tried together pursuant to the requirements of *State v. Boscarino*, 204 Conn. 714, 723, 529 A.2d 1260 (1987). To be sure, there were numerous witnesses who described many transactions over a period of approximately two and one-half years, but as white collar or corruption cases go, there was nothing unduly complex or confusing about the evidence in these two cases.

My search of our case law has not revealed an explanation or discussion of what constitutes a "complex" case. The term complex has been used in cases where expert testimony has been required, as the evidence "is not the kind of evidence that readily may be understood and evaluated by a fact finder on the basis of common sense or independent powers of observation or comparison." (Internal quotation marks omitted.) *Milton v. Robinson*, 131 Conn. App. 760, 781 n.20, 27 A.3d 480 (2011) (evidence involving complex and intricate details regarding multiple Food and Drug Administration regulations), cert. denied, 304 Conn. 906, 39 A.3d 1118 (2012); see also *State v. Radzvilowicz*, 47 Conn. App. 1, 38, 703 A.2d 767 (Internal Revenue Code has complex statutory and regulatory scheme), cert. denied, 243

Conn. 955, 704 A.2d 806 (1997). Obviously, every case must be evaluated in light of its own facts and circumstances; no mechanical test can be applied.

Basically, the cases here involved two distinct scenarios—a bribery case involving a kitchen renovation; and a larceny case relating to charges of extortion stemming from the parking lot transaction. Nothing about the length of the trial, or number of exhibits, or testimony by numerous witnesses concerning many interactions over an extended period of time changes my assessment. In *Boscarino*, our Supreme Court stated that in "a joint trial . . . an omnipresent risk is that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all. . . . This risk is greatly enhanced when the offenses joined are factually similar, but legally unrelated." (Citation omitted; internal quotation marks omitted.) *State* v. *Boscarino*, supra, 204 Conn. 721–22; see also *Drew* v. *United States*, 331 F.2d 85, 89 (D.C. Cir. 1964).[8] Unlike the four informations in *Boscarino* that each included charges of sexual assault, which our Supreme Court described as "factually similar, but legally unrelated"; *State* v. *Boscarino*, supra, 715; the scenarios set forth in the informations before the court in the case before us are separate and quite distinct— a kitchen renovation and streetscape project and a parking lot purchase.[9]

---

[8] In *Drew*, the United States Court of Appeals for the District of Columbia Circuit stated that two questions needed to be answered: (1) whether evidence of the other crimes would be admissible even if a severance was granted; and (2) if not, whether "the evidence of each crime is simple and distinct . . . ." *Drew* v. *United States*, supra, 331 F.2d 91; id., 91 n.14, quoting *Dunaway* v. *United States*, 205 F.2d 23, 27 (D.C. Cir. 1953) ("evidence is so separable and distinct with respect to each crime, and so uninvolved, and the offenses are of such nature, that the likelihood of the jury having considered evidence of one as corroborative of the other is insubstantial").

[9] The majority also cites *State* v. *Ellis*, 270 Conn. 337, 852 A.2d 676 (2004), for the proposition that its decision here is consistent with *Boscarino* analysis. Like *Boscarino*, *Ellis* also is a case involving multiple sexual assault

I am concerned that the majority's assertion that the jury was not able to consider each charge separately and distinctly due to the complexity of the evidence fails to provide concrete guidance to courts facing this issue in the future. It is not clear to me precisely why the majority concludes that the facts presented were so complex as to undermine the jury's ability to properly perform its fact-finding function. At least one federal circuit court of appeals has stated, "[w]eighing the danger of confusion and undue cumulative inference is a matter for the trial judge within his sound discretion. His denial of severance is not grounds for reversal unless clear prejudice and abuse of discretion is shown." *Johnson* v. *United States*, 356 F.2d 680, 682 (8th Cir. 1966).

Our review is not plenary. The question we are asked to answer is whether, under *Boscarino*, the trial court initially *abused its discretion* in permitting the cases to be tried together. The fact that another judge or set of judges might have ruled differently does not constitute an abuse of discretion. "[I]n reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Internal quotation marks omitted.) *State* v. *Jacobson*, 283 Conn. 618, 627, 930 A.2d 628 (2007).

informations that were consolidated for trial. In both cases, the informations were factually similar but legally unrelated. But also, in *Ellis*, before deciding the state's motion to consolidate; id., 369; the court ruled on the defendant's motion in limine regarding the testimony of one of the victims. Id., 352–68. The trial court, therefore, had significant factual information to consider beyond that alleged in the informations. That is not the procedural posture in the present case.

I also believe that the majority's conclusion pursuant to its *Boscarino* analysis significantly underestimates the ability of juries to understand judicial proceedings and properly evaluate evidence. Collectively, juries tend to be smart and perceptive, and jurors take their responsibilities very seriously. The jury here was aided by the trial court's extensive efforts to manage carefully the way in which evidence was presented and continuous reminders that the charges were to be assessed separately. See *State* v. *Davis*, supra, 286 Conn. 35 (trial court's thorough and proper jury instructions cured any risk of prejudice); see also *United States* v. *Pacente*, 503 F.2d 543, 551 (7th Cir.) (en banc) (trial judge's instructions provided meaningful protection against cumulation of evidence), cert. denied, 419 U.S. 1048, 95 S. Ct. 623, 42 L. Ed. 2d 642 (1974). Moreover, the jury here demonstrated that it could not only keep the cases separate, but also the counts within the informations. The jury found the defendant not guilty of count two in the bribery case.[10] In sum, I cannot agree that the court abused its discretion by initially failing to require separate trials pursuant to *Boscarino*.[11]

---

[10] In the bribery case, the defendant was accused of bribe receiving in violation of General Statutes § 53a-148 (a), fabricating physical evidence in violation of General Statutes § 53a-155 (a) (2), fabricating physical evidence in violation of General Statutes §§ 53a-8 and 53a-155 (a) (2), and conspiracy to commit fabricating physical evidence in violation of General Statutes §§ 53a-48 and 53a-155 (a) (2). The jury found the defendant not guilty of fabricating physical evidence in violation of § 53a-155 (a) (2).

[11] With respect to his objection to consolidation, had the defendant more specifically addressed the charges in the two informations and the inferences regarding intent that the jury would be required to consider, consolidation of the cases may have been an abuse of discretion. As a general proposition, I believe that it is an inherently suspect practice to require a defendant charged with political corruption to defend against multiple informations in one trial. In the cases at issue, the defendant's intent to be inferred from circumstantial evidence was *the* key issue. Unlike other sorts of crimes— burglary, for example, where keeping the facts separate is key; see generally *State* v. *Rodriguez*, 91 Conn. App. 112, 881 A.2d 371, cert. denied, 276 Conn. 909, 886 A.2d 423 (2005)—in corruption cases, the jury is asked to draw inferences with respect to intent, sometimes subtle ones, from circumstantial evidence.

## III

I agree with the majority's conclusion; see part II C of the majority opinion; that the defendant's rights were undermined and that he suffered substantial prejudice because his right to testify in the bribery case—but not the extortion case—was compromised. I concur with the majority's analysis on this issue and believe that it provides a separate, independent basis for reversal. See

"Substantial prejudice does not necessarily result from [joinder] even [if the] evidence of one offense would not have been admissible at a separate trial involving the second offense. . . . Consolidation under such circumstances, however, may expose the defendant to potential prejudice for three reasons: First, when several charges have been made against the defendant, *the jury may consider that a person charged with doing so many things is a bad [person] who must have done something, and may cumulate evidence against him* . . . . Second, the jury may have used the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial. . . . [Third] joinder of cases that are factually similar but legally unconnected . . . present[s] the . . . danger that a defendant will be subjected to the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all." (Emphasis added; internal quotation marks omitted.) *State* v. *LaFleur*, 307 Conn. 115, 155–56, 51 A.3d 1048 (2012).

It is precisely for the first reason that joinder is harmful and inherently unfair to a defendant in cases such as the ones underlying this appeal. There is simply too great a risk, under our system, that a jury will conclude that while a defendant may have lacked the intent to engage in corrupt conduct as to *one* charge, he could not have lacked the intent to engage in corrupt conduct as to a *second* charge. Stated otherwise, the mere fact that a defendant in cases of this sort is charged with two offenses in and of itself creates an unacceptable level of ineradicable prejudice, notwithstanding the degree of complexity involved. Moreover, if a jury can be expected to fairly evaluate two noncomplex cases joined together, why not three, or four, or five? Why not ten or twenty? Common sense informs us that this cannot be so. The fairest solution consistent with the presumption of innocence, in my view, would simply be to extend the logic of *Payne* and establish a rule that in all criminal cases in which joinder is not premised on cross admissibility there is a presumption *against* joinder. I am not suggesting that one category of cases—political corruption cases—should be treated differently from any other case. I would apply the same rule in *all* criminal cases in which evidence is not claimed to be cross admissible.

*State* v. *Chance*, supra, 236 Conn. 47–48. I conclude, therefore, that the trial court improperly denied the defendant's motion to sever at the conclusion of the state's bribery case.

For the foregoing reasons, I respectfully concur.